THE PRESBYTERIAN HOMES OF THE SYNOD OF NEW JERSEY, PETITIONER-APPELLANT, v. THE DIVISION OF TAX APPEALS, STATE OF NEW JERSEY, THE TOWNSHIP OF EAST WINDSOR, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, AND THE BOROUGH OF HIGHTSTOWN, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Argued September 23 and 24, 1969—Decided January 21, 1970.

*Mr. Morris M. Schnitzer* argued the cause for petitioner (*Messrs. Smith, Stratton, Wise & Heher,* attorneys; *Messrs. Garrett M. Heher* and *Waldron Kraemer* on the brief).

*Mr. Hervey S. Moore, Jr.* argued the cause for respondent Borough of Hightstown; *Mr. Henry F. Satterthwaite* argued the cause for respondent Township of East Windsor (*Mr. Henry A. Hill, Jr.* on the brief; *Messrs. Satterthwaite & Satterthwaite,* attorneys for respondent Township of East Windsor).

*Mr. Arthur J. Sills,* Attorney General of New Jersey, filed a statement in lieu of brief (*Mr. Charles H. Landesman,* Deputy Attorney General, of counsel).

The opinion of the court was delivered by

· Schettino, J. The issue before us is whether Meadow Lakes Village, a retirement community owned and operated by petitioner, The Presbyterian Homes of the Synod of New Jersey, is tax exempt within the meaning of *N. J. S. A.* 54:4–3.6, which provides in pertinent part:

The following property shall be exempt from taxation under this chapter: * * * all buildings actually and exclusively used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women and children, or for religious, charitable or hospital purposes * * * provided, in the case of all the foregoing, the building or the lands on which they stand, or the associations, corporations or institutions using and occupying them as aforesaid, are not conducted for profit, except that the exemption of the buildings and lands used for charitable, benevolent or religious purposes shall extend to cases wherein the charitable, benevolent or religious work therein carried on is supported partly by fees and charges received from or on behalf of beneficiaries using

or occupying the buildings; provided the building is wholly controlled by and the entire income therefrom is used for said charitable, benevolent or religious purposes.

The property straddles the line dividing the Township of East Windsor and the Borough of Hightstown. Both of these municipalities levied the disputed taxes for 1965.

The Mercer County Board of Taxation rejected petitioner's claim of exemption and held that the property was not operated for a "charitable purpose" as required by the statute. The Division of Tax Appeals affirmed. In an unreported *per curiam* opinion, the Appellate Division affirmed on the ground that there was ample evidence in the record to support the conclusion of the Division of Tax Appeals. Thereafter, we granted certification. 53 *N. J.* 349 (1969).

Petitioner was incorporated in 1916 as a New Jersey nonprofit corporation. It is operated by a board of trustees elected by the Synod of New Jersey, a part of the United Presbyterian Church, U. S. A. Among the purposes enumerated in its amended certificate of incorporation dated June 1, 1964 is "to provide and maintain retirement facilities and other services for those who desire entrance regardless of their race, religion or nationality." Petitioner's self-described objective is "to encourage the dignity of the individual and to care for the whole person."

In 1962 petitioner acquired the 103 acres upon which Meadow Lakes Village subsequently was erected. The facilities and operation of Meadow Lakes will be described as of the assessment date. Meadow Lakes then consisted of 23 apartment buildings with a total of 221 units, each connected by glass enclosed corridors. Most of the apartment units are garden apartments. The interiors are bright and emphasize a modern decor. Each occupant supplies his own furnishings which minimizes an "institutional" appearance. The entire complex is air-conditioned.

There are various recreational and service facilities, including fishing, barbecue and picnic areas, bowling greens, barber, gift and beauty shops, arts and crafts areas, lounges,

game rooms, a snack bar, a dining room, and a health center. The meals are prepared by an independent contractor and are served by waitresses.

Meadow Lakes has a total staff of 207 employees, with an estimated annual payroll of $810,000. It is nondenominational, and an analysis of the residents as of May 26, 1966 indicates that of the total number of 266, 104 were Presbyterian. Most of the remainder belonged to various Protestant denominations, but there were also some members of other faiths and several people professed no religious affiliation. The same analysis reveals that the residents who had been employed prior to entering Meadow Lakes were engaged in what might be called middle-class vocations—social workers, teachers, professionals, business executives, salesmen, and white-collar workers.

The financing arrangement is quite novel. The construction costs of Meadow Lakes exceeded $12,000,000. A part of the cost, $721,000, was borrowed from the Presbyterian Homes' endowment fund. There was also a Federal grant of $419,000 for the health center. A 25-year mortgage for $6,600,000 was obtained and the balance of $4,450,000 was provided by "founder's fees,"[1] paid by the original residents.

The founder's fees are, in effect, admission fees which are usually retained by Meadow Lakes. They are actuarily calculated so that at the end of 25 years, the mortgage, both principal and interest, will have been retired by utilizing founder's fees paid by present and future residents. If all goes according to plan, the property should be owned outright around 1990. The executive director of the Presbyterian Homes testified that anyone who could not afford the founder's fee need not apply for admission.

Under the original rate schedule, founder's fees ranged from $11,000 for a one-room studio to $31,500 for a large

---

[1] At the hearing before the Division of Tax Appeals, founder's fees were sometimes referred to as founder's charges or capital fees. Accordingly, these terms will be used interchangeably throughout this opinion.

two-bedroom, two-bathroom unit. By 1965, the rates had undergone two revisions and ranged from $12,000 to $43,000. It is noteworthy that Meadow Lakes contains only six of the minimum "capital fee" apartments and that the vast majority of the apartment units (134 out of 221) require a capital fee of $25,000.

The residents must also pay a monthly charge which ranges from $205 to $365, depending upon the number of occupants and the type of accommodation. Proceeds from the monthly charges are used exclusively for current operating costs—meals, utilities, maintenance and cleaning, hospitalization, etc. Thirty dollars of each monthly charge goes to the medical care fund, which pays for all medical care and expenses. The cost of these services is self-sustaining. If a patient has to be transferred from the medical unit to a hospital, all expenses are borne by petitioner with the exception of drugs and appliances.

Each resident signs a "residence agreement," several aspects of which are particularly relevant. If the resident fails to make a monthly payment within the prescribed time, the agreement provides that petitioner may serve notice that if payment is not made within a further 15 days, it may terminate the agreement. If the "sole and bona fide" reason for nonpayment is lack of funds, however, petitioner will "review" the matter, and the resident agrees to take all reasonable steps which petitioner may propose "in aid of the resident's financial condition." Nevertheless, the executive director testified that if the resident took all such steps and was still unable to pay, he would be permitted to remain. A fund, then totaling $2,342.50, had been established to aid needy residents.

The agreement further provides that if a resident becomes emotionally disturbed or acquires a contagious or dangerous disease, petitioner may effect a transfer to an appropriate institution, and such transfer terminates the agreement.

The corporation or the resident could terminate the agreement on 120 days notice for any or no reason. If the agreement is terminated for any reason other than death, there is a partial return of the capital fee, computed on a proration actuarial basis. This partial refund, however, occurs only when the apartment is occupied by a new resident who has paid his entrance fee. If death is the cause of termination, no part of the founder's fee is refundable. The executive director testified, however, that if a resident died very soon after occupying his apartment, the capital fee would be refunded to his estate.

Despite the testimony modifying its terms, the agreement also provides that it constitutes the entire contract, and that the corporation is not responsible for any statements not included therein. In addition, the corporation reserved the right to increase the monthly charge on 30 days notice "as may from time to time be determined to be necessary."

In regard to the nursing and health center, the executive director testified that its principal function was to provide "assistance or continuing care for the elderly" or for convalescents "who had been discharged from the hospital." The center had 90 beds, 65 of which were occupied. Of the 65, only 17 were occupied by Meadow Lakes residents. The non-residents were from various localities, and they paid $125 per week for a double room and $165 for a single. These fees covered only operating costs, i. e., nursing care, linen, and food. The costs for drugs and physicians were additional. Two patients were being subsidized at the time of the hearing.

The staff of the health center consisted of three doctors, including the medical director. There were 57 nurses, only 11 of whom were registered nurses. No doctors were at the health center in the evening; the center was then run by one registered nurse.

If a resident is transferred to the center for what appears to be a permanent basis, petitioner can assign his apartment to another resident. Upon release from the center, the resi-

dent has the right to occupy an equivalent apartment as soon as possible. If a resident needs medical care the center cannot provide, such as surgery, he will be transferred to a local hospital where the center's doctors are staff members.

Despite the substantial income from various sources, Meadow Lakes suffered a heavy operating loss during the tax year. It had operating income of $634,000 and operating expenses of $984,000, or a current deficit of $350,000. In addition, other expenses totaled $350,000, including interest on the mortgage, land depreciation, etc.

To determine whether Meadow Lakes is exempt from taxation requires consideration of the prescription of *N. J. S. A.* 54:4–3.6 that all property "actually and exclusively used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women and children, or for religious, charitable or hospital purposes" shall be tax exempt.

In *Princeton University Press v. Borough of Princeton,* 35 *N. J.* 209, 214 (1961), we set forth the guidelines for interpreting this statutory provision. The fundamental approach of our statutes is that ordinarily all property shall bear its just and equal share of the public burden of taxation. As the existence of government is a necessity, taxes are demanded and received in order for government to function, 51 *Am. Jur., Taxation,* § 9, p. 42 (1944). Under *N. J. S. A.* 54:4–3.6, exemption from taxation is tested by exclusiveness both of the organization's purpose and of the property's actual use for the moral and mental improvement of men, women and children or for religious, charitable or hospital purposes. The burden of proving tax-exempt status is upon the claimant.

Petitioner maintains that it satisfies these statutory requirements: it is a corporation organized exclusively for an exempt activity, it is non profit, and its property is exclusively used for such exempt activity. In petitioner's view, the care of the aged, of whatever financial ability, is *per se* an exempt activity. On the other hand, the Borough of

Hightstown and the Township of East Windsor argue that petitioner is primarily engaged in operating a luxurious retirement community which caters only to the needs of those able to pay.

■ Preliminarily, we note that in its petition for certification petitioner did not press its claim of exemption based on religious purposes. Moreover, this claim was not specifically passed on either in the Division of Tax Appeals or in the Appellate Division. We are satisfied that furnishing residential facilities to persons situated as are the residents of this property cannot be deemed to be a "religious purpose" within the intention of the exemption statute.

The principal question presented is whether the premises serve a "charitable purpose" within the meaning of the statute. We have not previously had occasion to define "charitable purposes" as used in *N. J. S. A.* 54:4–3.6.[2] Courts of other states with similar statutes have defined "charitable purposes" as:

[A]n application of property for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering and constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works, *or otherwise lessening the burdens on government.*

*Coyne Electrical School v. Paschen,* 12 *Ill.* 2d 387, 398, 146 *N. E.* 2d 73, 79 (Sup. Ct. 1957) (emphasis added). Accord,

---

[2] The meaning of "charitable purposes" was considered in several cases involving tax exemptions for educational institutions. See, *e. g., Dwight School of Englewood v. State Board of Tax Appeals,* 114 *N. J. L.* 594 (Sup. Ct. 1935), aff'd 117 *N. J. L.* 113 (E. & A. 1936); *Carteret Academy v. State Board of Taxes and Assessment,* 102 *N. J. L.* 525 (Sup. Ct. 1926), aff'd. 104 *N. J. L.* 165 (E. & A. 1927). These cases indicated that to constitute a charity, the institution must give substantially more to the public than it receives. The significance of these cases was undermined, however, in *The Kimberley School v. Town of Montclair,* 2 *N. J.* 28 (1949), wherein it was held that to qualify for an educational exemption, *N. J. S. A.* 54:4–3.6 does not require that these institutions be charitable as long as they are not conducted for profit.

*United Presbyterian Ass'n v. Board of County Com'rs., Colo.,* 448 P. 2d 967, 972 (Sup. Ct. 1969); *Boston Chamber of Commerce v. Assessors of Boston,* 315 *Mass.* 712, 716, 54 *N. E.* 2d 199, 201, 152 *A. L. R.* 174 (Sup. Jud. Ct. 1944); *In re Junior Achievement of Greater Minneapolis, Inc. v. State,* 271 *Minn.* 385, 390, 135 *N. E.* 2d 881, 885 (Sup. Ct. 1965); 15 *Am. Jur.* 2d, *Charities,* § 3, p. 8 (1964).

It is evident from the above definition that the term "charity" in a legal sense is a matter of description rather than a precise definition. Therefore, the determination of whether property is devoted to charitable purposes depends upon the facts or circumstances of each case. As a guide, however, it should be borne in mind that a sometimes stated justification for charitable tax exemptions is that if the charitable work were not being done by a private party, it would have to be undertaken at public expense. *United Presbyterian Ass'n. v. Board of County Com'rs., supra,* 448 P. 2d at 975; *Friendsview Manor v. State Tax Commission,* 217 *Or.* 94, 105–106, 420 P. 2d 77, 82 (1966), aff'd. on rehearing, 247 *Or.* 94, 427 P. 2d 417 (Sup. Ct. 1967).

Both petitioner and respondents have cited in their briefs numerous cases in which courts of other states have considered the exempt status of senior citizens' homes substantially comparable to Meadow Lakes. For some of the more recent cases holding such homes to be tax exempt because used for a charitable purpose, see *Fredericka Home for the Aged v. San Diego County,* 35 *Cal.* 2d 789, 221 P. 2d 68 (Sup. Ct. 1950); *State Board of Tax Com'rs. v. Methodist Home for the Aged, Ind. App.,* 241 *N. E.* 2d 84 (App. Ct. 1968); *Topeka Presbyterian Manor, Inc. v. Board of County Com'rs.,* 195 *Kan.* 90, 402 P. 2d 802 (Sup. Ct. 1965); *Bozeman Deaconess Foundation v. Ford,* 151 *Mont.* 143, 439 *P.* 2d 915 (Sup. Ct. 1968); *In re Tax Appeals of the United Presbyterian Homes of the Presbytery of Huntingdon,* 428 *Pa.* 145, 236 *A.* 2d 776 (Sup. Ct. 1968).

For cases reaching the contrary result, see *United Presbyterian Ass'n. v. Board of County Com'rs., supra,* 448 P. 2d

967; *Methodist Old Peoples Home v. Korzen,* 39 Ill. 2d 149, 233 N. E. 2d 537 (Sup. Ct. 1968) ; *Crestview of Ohio, Inc. v. Donahue,* 14 *Ohio St.* 2d 121, 236 *N. E.* 2d 668 (Sup. Ct. 1968) ; *Friendsview Manor v. State Tax Commission, supra,* 420 P. 2d 77; *Hilltop Village v. Kerreville Indep. Sch. Dist.,* 426 *S. W.* 2d 943 (Tex. Sup. Ct. 1968). As we have indicated, however, each claim for tax exemption must be determined upon the facts presented in light of our statutory provisions.

Petitioner emphasizes that Meadow Lakes is nonprofit and that it suffered a loss during the tax year in question. Nonprofit status, however, cannot be equated with charitableness. Rather, it is but one factor which merits consideration in the determination whether property is being used for charitable purposes.[3] In our view, the following are some of the more persuasive factors.

First, nothing in the articles of incorporation, the by laws or the residence agreement obligates petitioner to care for persons who become either financially unable to meet their monthly charges or unmanageable because of illness. On the contrary, petitioner has expressly reserved the right under such circumstances to terminate the residence agreement.

Second, if the agreement is terminated for reasons other than death, petitioner may then return residents to their families or place them in some other institution. Yet, a resident may well have expended all his assets in payment of the founder's fee. Since petitioner would only be obligated to

---

[3] After oral argument, petitioner notified us that Meadow Lakes had been granted a tax exemption under § 501(c)(3) of the Internal Revenue Code. This section enumerates classes of organizations which are exempt from federal income taxation. Its standards have no relation to state law governing property tax exemption. *Boston Chamber of Commerce v. Assessors of Boston, supra,* 54 N. E. 2d 199, 203 ; *Mountain View Homes v. State Tax Comm'rs.,* 77 N. M. 649, 655, 427 P. 2d 13, 17 (Sup. Ct. 1967) ; *cf. County of Douglas v. OEA Senior Citizens, Inc.,* 172 Neb. 696, 700–701, 111 N. W. 2d 719, 722 (Sup. Ct. 1961).

refund a portion of the founder's fee at most,[4] the State might then be required to care for such individuals during their declining years when their expenses are greatest.

■ Third, the amount and nature of the fees and rentals which petitioner requires the elderly residents to pay negates a "charitable purpose." Although charging rental does not necessarily deny a charitable purpose under *N. J. S. A.* 54:4–3.6, the facts in this case bring it squarely within the conclusion reached in *Methodist Old Peoples Home v. Korzen, supra*:

> While charging fees would not necessarily remove plaintiff from the category of a charitable institution . . ., the fact that it allocates living space from the standpoint of desirability of location and size on the basis of the amount of the Founder's Fees and monthly charges paid by a resident seems to us lacking in the warmth and spontaneity indicative of charitable impulse. Rather, it seems more related to the bargaining of the commercial market place. (233 N. E. 2d at 542)

■ Notwithstanding the above, petitioner argues that the care of the aged, whether rich or poor, is a "charitable work" and, therefore, property used in carrying out such work is "used actually and exclusively for charitable purposes." The basic deficiency in petitioner's argument, however, is that the residents of Meadow Lakes have purchased that which they are receiving; *quid pro quo* permeates the entire operation. If petitioner's position is sound, then persons of advanced age could simply avoid property taxes by pooling assets in corporate form for their mutual benefit. Moreover, as stated in *Friendsview Manor v. State Tax Commission, supra*:

---

4 The residence agreement provides:
"from the Capital Fee paid by the Resident there shall be deducted a sum equal to two percent (2%) of such gift, multiplied by the number of full calendar months which elapse from the date of occupancy to the effective date of termination. The remainder, if any, shall be refunded to the Resident."

> If the . . . [petitioner's] contention is correct, the charitable tax exemption must be granted to many other self-help projects that provide services which if provided *to others* are held to be for charitable purposes.
>
> The construction of a swimming pool or golf course can be a charitable purpose. Such facilities benefit the community by promoting health and teaching physical education. According to the reasoning of the plaintiff, a group can pay its funds into a nonprofit corporation, organize as Friendsview Manor is, have a pool or golf course built, and credit each hour spent in the pool or a round upon the course against the initial fee paid to construct the facility, and the pool or golf course would be exempt as used exclusively in a charitable work. (420 P. 2d at 80)

Therefore, although care of the aged may be laudable, whether it will constitute a charitable purpose depends upon the manner in which the particular property is used to accomplish that end.

Prior cases in our State have acknowledged that care for the needy aged is a proper concern of government, and property used for that purpose has been held to be exempt from taxation. *Paterson Rescue Mission v. High,* 64 *N. J. L.* 116 (Sup. Ct. 1899); *City of Asbury Park v. Salvation Army,* 26 *N. J. Misc.* 170, 58 *A.* 2d 216 (Div. Tax App. 1948). But we believe that those cases do not embrace the care of financially independent elderly persons who alone can qualify for admission to Meadow Lakes.

█ Undoubtedly, petitioner was altruistically motivated in building such a fine and suitable residence for senior citizens as Meadow Lakes. Petitioner's desire to develop a congenial environment for elderly persons, to plan social and recreational activities compatible with their age, and to provide a wide variety of services, is to be commended. But they are all acts and services readily within the ability of any organization or even individuals to perform. Based on the factors we have previously enumerated, we conclude that petitioner's property is not tax exempt since it is not "actually" used for "charitable" purposes.[5]

---

[5] In view of our conclusion, we deem it unnecessary to discuss the "exclusive use" requirement. This requirement, however, has met with

Petitioner asserts two additional grounds for tax exemption which deserve mention. First, petitioner argues that notwithstanding the failure of Meadow Lakes to qualify for an exemption on religious or charitable grounds, the health center should nevertheless be exempt on the basis that it is actually and exclusively used for hospital purposes.

However, we agree with the Appellate Division's conclusion that the opinion of the Division of Tax Appeals — the "hospitalization functions of the project are merely incidental to the main function" — was supported by substantial evidence.

Lastly, petitioner argues that rejection of its claim for tax exemption would constitute a denial of equal protection of the laws. Specifically, petitioner claims that since New Jersey "subsidizes" moderate income housing built by corporations irrespective of whether they are operated for profit, the "denial of exemption to the moderate income aged, because a religious organization undertakes to provide a total environment at a moderate cost which the beneficiaries can pay, would be a discrimination offensive to the equal protection requirement of the State and Federal Constitutions."

Petitioner did not raise the above constitutional issue in either the Division of Tax Appeals or the Appellate Division. This Court may, but need not, accept a constitutional question not raised below. *Lettieri v. State Bd. of Medical Examiners,* 24 *N. J.* 199, 206 (1957).

In any event, we find no merit in petitioner's claim. Meadow Lakes provides luxurious retirement facilities to those who are able to pay. Moreover, its charges cannot be deemed low. Such housing is in no sense comparable to the "adequate, safe and sanitary dwelling units" contemplated

judicial scrutiny on numerous occasions. See *Township of Teaneck v. Lutheran Bible Institute,* 20 *N. J.* 86 (1955); *City of Asbury Park v. Div. of Tax Appeals,* 41 *N. J. Super.* 504 (App. Div. 1956); *Sisters of Peace v. Westervelt,* 64 *N. J. L.* 510 (Sup. Ct. 1900); aff'd. 65 *N. J. L.* 685 (E. & A. 1901); Girls Friendly Soc'y v. Cape May, 20 *N. J. Misc.* 65, 24 *A.* 2d 410 (State Bd., Tax Appeals 1942).

in *N. J. S. A.* 55 :14J–2. Therefore, we find it unnecessary to discuss the nature of the subsidy given to moderate income housing. We fail to see how any invidious discrimination would arise if, as petitioner describes itself in a brochure, Meadow Lakes with its "gracious retirement living," is denied tax-exempt status.

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.