**Lutheran Home Tax Assessment**

*Benjamin R. Neilson* and *H. Ober Hess*, for petitioner.

*Frederick G. McGavin*, County Solicitor, for Berks County.

HESS, P. J., December 13, 1971.—The Lutheran Home at Topton, Pa., has appealed from an assessment placed on a portion of its real property by the Board of Assessment and Revision of Taxes. In fact, separate appeals were filed, three appeals involving parcels of property upon which the board placed assessments for the year 1969, and 25 appeals involving assessments for the year 1970. Counsel have entered into a stipulation that all appeals present the same issues of law and of fact, and that the final determination in the present case shall be applicable to all other appeals.

The Lutheran Home at Topton was founded in 1897 as a "charitable and benevolent" orphanage. In 1940, the home began admitting the aged into care, and in subsequent years this service has substantially increased with a concomitant decrease in the number of children served. Presently, the home is open to children and the aged of all faiths and races. In addition to the cottage residents, the home serves a total of 180 aged people in ambulatory self-care, sometimes referred to as group living, and infirmary care. At Topton, the Heilman Cottage accommodates 24 ambulatory residents, and the Annie Lowry cottage, 10. The Henry infirmary at Topton now provides for 100 patients, and in addition, the home operates another facility in Reading called the Caum Memorial Building

with 34 people in infirmary care and 16 in ambulatory group care.

The home began to provide cottages for the aged about 1962, not as "a separate retirement development for older people but an integral part of the total program of serving the aged." Construction was paid for out of the home's unrestricted endowment funds. At the present time, the home owns 36 separate retirement cottage buildings, of which 28 are single residences, six contain two apartments, and two contain three apartments. These facilities are presently inhabited by 66 aged persons, one is occupied by a retired man whose wife is employed by the home as Director of Activities, and one is occupied by the home's caretaker and his wife and daughter.

Physically, the cottages are adapted to the needs of the elderly. They are ranch-type, i.e., all on one floor. As many steps as possible have been eliminated with the substitution of ramps, and all doorways have been constructed with sufficient width to accommodate wheelchairs. The bathrooms are fitted with bars within reach of the fixtures in order to assist the residents in using them. All of these features have been included with the idea of "making it as easy for (the aged) . . . as possible to manage their own daily activities . . . with the infirmities of age, as they come on . . ."

To be eligible for admission as a cottage resident of the home, a person must be at least 65 years old, or in the case of a couple, at least one of the spouses must be 65. Also, an applicant must submit a health report which is reviewed by the home's physician. Similarly, a statement of the applicant's financial condition is submitted to the home's board of directors. The primary purpose of the fiscal and physical reports is to assure that the applicant will be able to live inde-

pendently and thus obtain the benefit of the cottage situation.

While the resident occupies his cottage, the home renders his life as carefree as possible by providing indoor and outdoor maintenance, snow and garbage removal, grass cutting, and insurance. The home attempts to keep several beds in the infirmary unoccupied in order that cottage residents may be transferred to the infirmary for temporary care. Not only does the home have arrangements with the Reading and Allentown Hospitals if a cottage resident requires hospitalization, but also the home has indicated a willingness to pay the costs outstanding after Medicare and the resident's resources are exhausted. Similarly, the home is willing to move a widow or a widower who finds the cottage lonesome after the death of a spouse into the group living program. Since the initiation of cottage living, transfers to group living have, in fact, occurred for this reason.

A cottage resident of the home becomes a part of a family or community of aged people. The home has its own Lutheran religious congregation and a chapel on the premises at Topton. There are services every Sunday morning, and at least 80 percent of the cottage residents, including some non-Lutherans, attend. In addition, there are midweek services during Lent, and throughout the year the superintendent carries out the normal pastorial duties of visiting and counseling among the cottage residents, as with the other members of the home's family. Meals are available in the home's dining room to cottage residents at modest cost.

The home has an extensive program of volunteer service in which about three-quarters of the cottage residents participate. This includes assistance in the home's infirmaries—feeding patients, hairdressing for

female patients, and the like. In 1969, the home recorded approximately 85,000 hours of volunteer service of which the cottagers contributed over 11,000. Cottage residents also participate in the crafts program.

When an applicant for cottage residence is accepted, he pays an admission fee which represents two factors. One is the basic cost of erecting the building and the other is a portion of the total cost of developing the entire tract of cottages for construction, called land development cost. The land development cost has arbitrarily been fixed at $3,600 for each unit.[1] The home treats the admission fee as a liability and takes into current income for the cottage program five percent of the admission fee per year as an offset to the annual cost of insurance and services provided by the home, including indoor and outdoor maintenance of the building, snow and garbage removal and lawn care. Should a cottage resident require either temporary or permanent infirmary care, he is charged 50 percent of the prevailing rate and the other 50 percent is deducted from the remainder of the admission fee. In addition to the foregoing, the resident pays a monthly charge of $15 to the home to cover "normal" electric use, sewage, water, and garbage removal. An additional $10 a month is charged for cottages which are heated by electricity which comes through one meter for the entire home. (In the case of cottages heated by gas, the resident pays directly to the utility company.) In the case of a unit occupied by a single person, the $15 charge is reduced to $10.

The home has three financial plans for noncottage residents. About 58 percent are cared for under Plan

---

[1] The admission fees have ranged from $9,000 to more than $20,000.

III, which means that the resident turns over to the home whatever public assistance and/or Social Security he has and pays nothing further. About 22 percent of the residents are under Plan I whereby the individual turns over all of his assets and thereafter has his monthly board charge deducted until the assets are exhausted. He then continues under Plan III. Twenty percent of the residents are under Plan II: they pay the regular monthly board charge and also make a payment of $25 per month to the home's capital fund.

Prior to the calendar year 1969, the home did not report the results of the cottage program separately in its financial statements. However, in 1969 the program showed a loss of almost $9,000. The home's overall income. statements for the year 1967 showed a surplus of approximately $40,000 added to capital, for the year 1968 a deficit of approximately $48,000 charged to capital, and for the year 1969 a surplus of approximately $14,000 added to capital. In these years current contributions and income on past contributions, including bequests, exceeded any surpluses from operations. At the time of the trial, the comptroller of the home indicated that for the first nine months of 1970 the home showed an operating deficit of some $20,000.

Each applicant for cottage living is required to execute a contract similar to Exhibit 11 and, if admitted, pay the admission fee which has been determined as we have already indicated. In the event that an applicant desires to withdraw from the cottage program, he is not entitled to any refund. Should charges against his admission fee exhaust the fee and other individual resources, he "may be" accepted under the group living program but he has no contractual right to that effect. It is apparent that presently the

home plans to allow such privilege but is not required to do so.

Presbyterian Homes Tax Exemption Case, 428 Pa. 145, cited with approval in Vanguard School Tax Exemption Case, 430 Pa. 378, would appear to justify the position of appellant that its property is entitled to tax exemption. The Presbyterian case clearly recognizes that homes for the aged, if operated as institutions of "purely public charity" within the meaning of the Constitution of Pennsylvania, are entitled to real property tax exemption. The case also recognizes that the concept of charity is continually broadening, and a requirement that an aged person pay a substantial sum towards his maintenance will not ipso facto prevent an institution from being a "purely public charity." Presbyterian emphasizes that determination of "purely public charity" involves questions of fact and of law. "Consequently, prior cases have limited value as precedent": Presbyterian Homes Tax Exemption Case, supra, 149.

With this concept in mind, the county solicitor contends Presbyterian is in no way controlling, alleging that only well-to-do persons can fulfill the requirements imposed by appellant for cottage residence; that the contract entered into by the home and cottage residents does not assure the individuals maintenance for life; that, in fact, the home is departing from its charitable purpose when it requires large admission fees from prospective applicants who, after being admitted, must assume the cost of their living and other expenses. It is clear from the evidence that the admission fees for cottage residents are indeed substantial. Furthermore, Exhibit 11 does provide that such residents pay their ordinary living expenses and medical care. In the event that the individual with-

draws from the plan, the home is not obligated to refund any unused portion of the admission fee. Finally, in the event that a resident finds his financial resources exhausted, he "may become" eligible for group living at the home. In spite of the assurances given by the administrator of the home that the individual would be taken care of in the event of financial adversity, we deem it important to note that such is not legally required as we interpret Exhibit 11.

In 1970, the Supreme Court of our sister State, New Jersey, had occasion to pass upon the question of tax exemption for a home for the aged in the case of The Presbyterian Homes of the Synod of New Jersey v. The Division of Tax Appeals, State of New Jersey et al., 55 N.J. 275, 261 A. 2d 143. In that case, the court considered the pronouncement of our Supreme Court in Presbyterian Homes Tax Exemption Case, supra, but on the facts found that appellant was not entitled to exemption. It is true that in the New Jersey case the financial charges and capital or admission fees were larger than in the case before us but, after reviewing a number of cases from various jurisdictions, including Pennsylvania, the court found certain factors relevant to the question, 261 A. 2d 143, 148-9:

"Petitioner emphasizes that Meadow Lakes is non-profit and that it suffered a loss during the tax year in question. Nonprofit status, however, cannot be equated with charitableness. Rather, it is but one factor which merits consideration in the determination whether property is being used for charitable purposes. In our view, the following are some of the more persuasive factors.

"First, nothing in the articles of incorporation, the bylaws or the residence agreement obligates petitioner to care for persons who become either financially unable to meet their monthly charges or unmanageable

because of illness. On the contrary, petitioner has expressly reserved the right under such circumstances to terminate the residence agreement.

"Second, if the agreement is terminated for reasons other than death, petitioner may then return residents to their families or place them in some other institution. Yet, a resident may well have expended all of his assets in payment of the founder's fee. Since petitioner would only be obligated to refund a portion of the founder's fee at most, the State might then be required to care for such individuals during their declining years when their expenses are greatest.

"Third, the amount and nature of the fees and rentals which petitioner requires the elderly residents to pay negates a 'charitable purpose.' Although charging rental does not necessarily deny a charitable purpose under N.J.S.A. 54:4-3.6, the facts in this case bring it squarely within the conclusion reached in Methodist Old Peoples Home v. Korzen [39 Ill. 2d 149]."

The facts of our case are in most respects similar to the facts considered important in the New Jersey case except that there is no right reserved to terminate the agreement because of illness. On the other hand, the case cited does indicate that residents may for certain reasons receive a refund of the admission fee, while in our case the home is never obligated to refund any portion of the admission fee: Exhibit 11, para. 12. Furthermore, pursuant to paragraph 14 of said exhibit, "The Board of Trustees of Home reserves the right to change, alter, modify or revise any and all of these provisions and regulations when necessary." It would appear that the quoted provision gives the home the legal right to change the contract at will but does not permit the resident to have a similar right.

We are completely satisfied that the holding of the

New Jersey Supreme Court would indicate that, on the facts before us, the home is not entitled to tax exemption on the cottages involved in the residence program. It is true that we are not bound by the pronouncements of the courts of New Jersey. On the other hand, we cannot find that the reasoning of the court of our sister State in any way conflicts with the reasoning and conclusion of our Supreme Court in Presbyterian Homes Tax Exemption Case, supra. The facts are substantially different and in our opinion, as well as in the opinion of our Supreme Court, as previously quoted, the factual situation is as much pertinent to a solution of tax exemption cases as is the law as pronounced in prior decisions of the courts.[2]

We do not in any way intend to reflect adversely upon the program of the home for residence cottages or upon the manner in which its general charitable purpose is carried on. For many years the home has been an extremely valuable part of our community, providing care for children and the aged. The home has at all times earned and enjoyed the goodwill, respect and appreciation of the court and of our fellow citizens. Upon the narrow question of tax exemption, the home must meet a real burden because "a statute exempting property from taxation must be strictly construed": Y.M.C.A. v. Reading, 402 Pa. 592.

We conclude that all of the cottages which are available for aged residents, under the record before us, fail to meet the requirements for tax exemption. On the

---

[2] For an excellent discussion and annotation of the authorities in various jurisdictions see Homes for the Aged as Exempt from Property Taxation by John D. Perovich, J.D., 37 A.L.R. 3d 565. Also Receipt of Pay from Beneficiaries as Affecting Tax Exemption of Charitable Institutions by Elizabeth T. Tsai, B.S.J., LL.B., LL.M., 37 A.L.R. 3d 1191, especially page 1248, et seq., where Pennsylvania cases are considered.

other hand, two residences are utilized for housing employes and family members, the employes being required to live upon the premises as part of the condition and terms of employment. The county does not strongly contend that these two properties are taxable. On the authority of University of Pittsburgh Tax Exemption Case, 407 Pa. 416, and Albright College Tax Assessment Case, 213 Pa. Superior Ct. 478, we are completely satisfied that at this time the two properties are entitled to exemption. Should the factual situation change, the home may not be entitled to the exemption which we now allow.

And now, December 13, 1971, the appeal of Lutheran Home at Topton, Pa., is dismissed except as otherwise herein provided. Counsel may prepare and submit a separate order applicable to each appeal in accordance with the opinion of the court.