28 A.3d 841 (2011)
422 N.J. Super. 317
ADVANCE HOUSING, INC. and Advance Housing 2000, Plaintiffs-Appellants,
v.
TOWNSHIP OF TEANECK, Borough of Bergenfield, Borough of Little Ferry, Borough of Ramsey, Borough of Ridgefield Park, Borough of Lodi, Borough of Fairview, Borough of Leonia, City of Hackensack, Defendants-Respondents.
No. A-0728-09T3.
Superior Court of New Jersey, Appellate Division.
Argued March 15, 2011.
Decided October 4, 2011.
*842 Joel M. Ellis argued the cause for appellants (Kates Nussman Rapone Ellis & Farhi, LLP, attorneys; Mr. Ellis, Michael B. Kates, Hackensack, and Joshua K. Givner, Pleasantville, on the brief).
*843 William F. Rupp, Hackensack, argued the cause for respondent Township of Teaneck (Ferrara, Turitz, Harraka & Goldberg, P.C., attorneys; Mr. Rupp, on the brief).
Harry D. Norton, Jr., argued the cause for respondent Borough of Ramsey (Norton, Sheehy, Higgins & Rosa, P.C., attorneys; Mr. Norton, of counsel; Neil A. Tortora, West Paterson, on the brief).
William R. Betesh, Ridgefield Park, argued the cause for respondent Village of Ridgefield Park (Durkin & Boggia, attorneys; Mr. Betesh, on the brief).
Durkin & Boggia, Ridgefield Park, attorneys for respondent Borough of Bergenfield, join in the brief of respondents Village of Ridgefield Park, Borough of Ramsey and Township of Teaneck.
Dennis A. Maycher argued the cause for respondent Borough of Fairview (Law Offices of Dennis A. Maycher, attorneys; Mr. Maycher and Jason L. Bittiger, Garfield, on the brief).
Joseph G. Monaghan, Hackensack, argued the cause for respondent Borough of Little Ferry (Mr. Monaghan joins in the brief of the Borough of Ramsey).
Donald J. Lenner argued the cause for respondent City of Hackensack (Mr. Lenner joins in the brief of the Borough of Ramsey).
Scott G. Sproviero, attorney for respondent Borough of Lodi, joins in the brief of all respondents.
Kenneth H. Zimmerman, Roseland, argued the cause for amici curiae The Judge David L. Bazelon Center and the Office of the Public Defender (Lowenstein Sandler PC and Yvonne Smith Segars, Public Defender, attorneys; Mr. Zimmerman, Brian A. Silikovitz, Thomas S. Dolan, Isaac R. Hirsch, and Rebecca H. Estelle, Assistant Deputy Public Defender, on the brief).
Amicus Curiae National Council for Community joins in the brief of The Judge David L. Bazelon Center and the Public Defender.
Before Judges CARCHMAN, MESSANO, and WAUGH.
The opinion of the court was delivered by WAUGH, J.A.D.
Plaintiffs Advance Housing, Inc. (Advance Housing), and its subsidiary Advance Housing 2000, Inc. (Advance 2000), appeal the September 2, 2009 judgment of the Tax Court denying them real property tax exemptions under N.J.S.A. 54:4-3.6 for tax years 2002 through 2004 for properties they own in nine municipalities in Bergen County. We reverse.

I.
We discern the following facts and procedural history from the record on appeal.

A.
Advance Housing is a non-profit corporation that provides affordable, supportive housing and services for people with severe and persistent psychiatric disabilities. According to its by-laws, Advance Housing was organized, among other reasons, "[t]o promote and provide permanent normalized community living arrangements for psychiatrically disabled individuals in Bergen County, New Jersey" and "[t]o promote and provide decent, affordable housing for low-income and moderate-income families or family members who are psychiatrically disabled." Its certification of incorporation contains similar language.
Advance 2000's by-laws provide that it was organized
[t]o [provide] elderly or disabled persons with housing facilities and services specifically *844 designed to meet their physical, social and psychological needs, and to promote their health, security, happiness and usefulness in longer living, the charges for such facilities and services to be predicated upon the provision, maintenance and operation thereof on a nonprofit basis.
Its certification of incorporation contains similar language.
Plaintiffs describe supportive housing as a more cost-effective alternative to group homes as a vehicle to effectuate the de-institutionalization of people with significant psychiatric disabilities. Plaintiffs also describe it as a more cost-effective approach to addressing the needs of the homeless with those disabilities, who would otherwise require more expensive periodic hospitalization or might become involved with the criminal justice system.
Kevin Martone, Advance Housing's former President and Chief Executive Officer, certified that approximately seventy percent of plaintiffs' clients "had been institutionalized for significant periods of time; [and that] all others had a history of psychiatric hospitalization, homelessness or were at risk of homelessness due to their psychiatric disability." Plaintiffs contend that their model of supportive housing "blends comprehensive, flexible services with affordable, lease-based housing." They rely primarily on grants from governmental and charitable sources to cover the costs of the services and housing they provide.
The services offered by Advance Housing include supportive counseling and intervention; medication monitoring and education; vocational training and guidance; budgeting assistance; coordination of benefits and entitlements; transportation to medical and other appointments; nursing assessments and medical follow-up; assistance with meal planning and food shopping; crisis intervention; assistance and training in apartment maintenance; assistance with activities of daily living such as personal hygiene, grooming, cooking, cleaning, and paying bills; and linkage to and communication with other services such as day programs and Social Security. Martone estimated that ninety-nine percent of these services take place in the client's residence.
The frequency of services provided by Advance Housing varies from person to person. Some clients are seen every day, while others are seen once a week. In addition, Advance Housing's case managers have telephone contact with clients, as well as their service providers, physicians, and benefit agencies.
Advance Housing provides supportive services and counseling for the residents of all the properties at issue, as well as residents of housing not provided by either plaintiff. It has approximately 105 clients receiving supportive services, thirty-five of whom reside in the fourteen properties involved in this appeal.[1] Advance Housing assists prospective clients in obtaining housing from third-parties if it is unable to provide housing itself or through Advance 2000.
Advance Housing obtained funding to purchase the subject properties from a variety of sources, including the United States Department of Housing and Urban Development (HUD), the Division of Mental Health Services in the New Jersey Department of Health and Senior Services, and county-run programs. Additional funding was obtained through private donations. For example, a single-family house in Little Ferry was received as a donation.
*845 Although Advance Housing owns some of the subject properties directly, it created Advance 2000 to acquire and own the remaining properties in order to comply with HUD's requirements concerning the acquisition of housing using HUD funding. The Internal Revenue Service has exempted both Advance Housing and Advance 2000 from federal income taxation.
When a client obtains housing directly from plaintiffs, a market rent is established for each unit in compliance with HUD's Section 811 Supportive Housing Program. See 42 U.S.C.A. § 8013; 24 C.F.R. §§ 891.100 to .865. However, the rent actually paid by the client is limited to thirty percent of the client's adjusted income, with the remaining rent coming from HUD or other available funding sources. The rent covers expenses associated with operating the rental unit. If a client is unable to make a rental payment, Advance Housing seeks alternative funding. The lease provides that residents can be evicted if they violate terms of the lease, including non-payment of rent. However, no tenant has ever been evicted by Advance Housing or Advance 2000.
To be eligible for housing and related services, each client must demonstrate a need for supportive housing. Consequently, each individual receiving housing and related services has a psychiatric diagnosis. Because HUD also provides funding for those who require supportive housing but do not require additional services, it mandates that residents cannot be required to accept any supportive service as a condition of occupancy. 42 U.S.C.A. § 8013(i)(2)(c). Consequently, plaintiffs' leases do not mandate that the client actually participate in counseling services. Nevertheless, according to Martone, all of Advance Housing and Advance 2000's tenants actually receive services from Advance Housing.
Advance Housing can terminate clients from the program if they require a higher level of services, such as twenty-four-hour on-site care, or if they no longer require supportive housing. Narcotics use is also grounds for termination, but no tenant has been evicted for that reason.
According to Martone, some clients would be at risk for homelessness without supportive housing. Others might be placed in more costly levels of care, such as group homes or institutions. In Martone's opinion, the overall quality of life of those clients would decrease, while the use of public resources such as "police, fire[fighters], ambulances, and emergency rooms" would increase. There would also be a potential risk to the public if such individuals stopped taking their medications. Martone estimated that institutional care costs $120,000 to $146,000 per client each year, and that group homes providing twenty-four-hour care cost from $60,000 to $85,000 per year. Advance Housing's program costs approximately $20,000 per year.
According to Mary Rossettini, Advance Housing's President and Chief Executive Officer, the two elements of its program, "housing and services, cannot exist independently," but "are intertwined and each is vital to the other." Each client requires different services for various durations of time throughout the course of each week. While the needs are not the same, such that one client may require more services than another, all clients require some level of services in order to live independently.

B.
Because the defendant municipalities refused to exempt the properties owned by Advance Housing and Advance 2000 from taxation pursuant to N.J.S.A. 54:4-3.6, they filed tax appeals with the Bergen *846 County Board of Taxation (County Board) for tax years 2002, 2003, and 2004. After the County Board affirmed the municipal decisions, Advance Housing and Advance 2000 filed appeals in the Tax Court.
Plaintiffs claim exemption from real estate taxation under four sections of N.J.S.A. 54:4-3.6:(1) the provisions related to those who are "feebleminded," "idiotic," or "mentally retarded," (2) the provision related to "the moral and mental improvement of men, women and children," (3) the provision related to "hospital purposes," and (4) the general provision concerning properties "actually and exclusively used in the work of one or more associations or corporations organized exclusively for charitable ... purposes."
All parties stipulated that the cases could be resolved by cross-motions for summary judgment, which were filed in July 2005. The motions were argued on June 30 and August 1, 2006. The motion judge reserved decision.
On September 19, 2008, the judge delivered an oral decision granting partial summary judgment to the defendant municipalities under the "feebleminded" exemption then contained in N.J.S.A. 54:4-3.6. On December 17, the judge signed an order granting partial summary judgment to the municipalities under the "feebleminded" and "hospital purposes" exemptions of N.J.S.A. 54:4-3-3.6. The order also set forth the judge's determination that plaintiffs had satisfied the first two prongs of the three-prong test for property tax emption established by the Supreme Court in Presbyterian Homes of Synod of New Jersey v. Division of Tax Appeals, 55 N.J. 275, 283, 261 A.2d 143 (1970). He determined that they were organized for the particular purpose for which the exemption was claimed and that they operate on a non-profit basis.
The motion judge requested additional factual material and briefing on the remaining element of the Presbyterian Homes test, which is whether the properties were "actually and exclusively" used for charitable purposes. On June 15, 2009, the judge heard additional oral argument, and again reserved decision. On June 23, he delivered an oral decision granting summary judgment in favor of the municipalities.
A judgment denying the tax exemptions for tax years 2002, 2003, and 2004 was entered on September 2, 2009. By that time, plaintiffs had filed tax appeals in the Tax Court on the same properties for tax years 2005 through 2009, and also for additional Bergen County properties they acquired after tax year 2004. All parties stipulated that the same facts would apply to those pending cases and that the deposition of those cases would be governed by the outcome of plaintiffs' intended appeal of the Tax Court's September 2009 judgment.
This appeal followed.

II.
Before addressing the specific issues raised on appeal, we outline our standard of review and the general principles that govern cases involving property tax appeals.

A.
Although the factual findings of a Tax Court judge are entitled to deference because of that court's expertise in the field, the judge's interpretation of a statute is not entitled to such deference and is subject to our de novo review. Dover-Chester Associates v. Randolph Twp., 419 N.J.Super. 184, 195, 16 A.3d 467 (App.Div. 2011) (citing Twp. of Holmdel v. N.J. Highway Auth., 190 N.J. 74, 86, 918 A.2d *847 603 (2007)); see also Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995) ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference."). Consequently, we review the motion judge's grant of summary judgment to the municipal defendants de novo, applying the same standard governing the trial court under Rule 4:46-2(c). Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 539-40, 666 A.2d 146 (1995); Chance v. McCann, 405 N.J.Super. 547, 563, 966 A.2d 29 (App.Div.2009) (citing Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46, 916 A.2d 440 (2007)).
In addressing a motion for summary judgment, a court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill, supra, 142 N.J. at 540, 666 A.2d 146; see also R. 4:46-2(c). Here, both sides argued in the Tax Court and again before us that the case can be determined on cross-motions for summary judgment.

B.
In Princeton Univ. Press v. Borough of Princeton, 35 N.J. 209, 214, 172 A.2d 420 (1961)(some citations omitted), the Supreme Court outlined the approach to be taken by a court in determining whether an exemption for real property taxation is applicable.
The fundamental approach of our statutes is that ordinarily all property shall bear its just and equal share of the public burden of taxation. As the existence of government is a necessity, taxes are demanded and received in order for government to function. 51 Am. Jur., Taxation, § 9, p. 42. Statutes granting exemption from taxation represent a departure and consequently they are most strongly construed against those claiming exemption.
Consequently, "the party claiming the exemption must bear the burden of proof demonstrating entitlement to the exemption." Twp. of Monroe v. Gasko, 182 N.J. 613, 620-21, 868 A.2d 1022 (2005)(citing Princeton Univ. Press, supra, 35 N.J. at 214, 172 A.2d 420).
Nevertheless, while the construction of the applicable statute must be strict, it must also be reasonable. Int'l Sch. Servs., Inc. v. West Windsor Twp., 412 N.J.Super. 511, 524, 991 A.2d 848 (App.Div.2010)(citing Twp. of Princeton v. Tenacre Found., 69 N.J.Super. 559, 563, 174 A.2d 601 (App.Div.1961)), aff'd, 207 N.J. 3, 21 A.3d 1166 (2011). The rule of strict construction must not defeat the evident legislative design. Ibid.; see also Hunterdon Med. Ctr. v. Twp. of Readington, 195 N.J. 549, 569, 951 A.2d 931 (2008).

III.
On appeal, plaintiffs argue that the motion judge erred in finding that their housing element was not fully integrated with their supportive and counseling services program, as a result of which he had determined that they did not meet the statute's "actually and exclusively used" requirement.[2] The municipalities urge us to uphold the judge's ruling in that regard. In addition, Ridgefield Park and Fairview *848 argue that the motion judge erred in determining that Advance Housing and Advance 2000 are non-profit entities, pointing to plaintiffs' use of market rental rates and their right to enforce the payment of rent.
The disposition of this appeal turns on the interpretation and application of N.J.S.A. 54:4-3.6. During the tax years at issue on this appeal, the statute provided, in pertinent part, as follows:
The following property shall be exempt from taxation under this chapter:... all buildings actually and exclusively used for ... asylum or schools for feebleminded or idiotic persons and children;... all buildings actually used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women and children, provided that if any portion of a building used for that purpose is leased to profit-making organizations or is otherwise used for purposes which are not themselves exempt from taxation, that portion shall be subject to taxation and the remaining portion only shall be exempt; ... all buildings owned by a corporation created under or otherwise subject to the provisions of Title 15 of the Revised Statutes [Corporations and Associations Not for Profit] or Title 15A of the New Jersey Statutes [Corporations, Nonprofit] and actually and exclusively used in the work of one or more associations or corporations organized exclusively for charitable or religious purposes, which associations or corporations may or may not pay rent for the use of the premises or the portions of the premises used by them; ... the land whereon any of the buildings hereinbefore mentioned are erected, and which may be necessary for the fair enjoyment thereof, and which is devoted to the purposes above mentioned and to no other purpose and does not exceed five acres in extent.
[N.J.S.A. 54:4-3.6 (emphasis added).[3]]
In his June 23, 2009 oral decision, the motion judge addressed the issue of whether plaintiffs' program was a single integrated program that tied housing and supportive services together or separate programs, housing and services, run by essentially the same entity. He found that it was the latter. Plaintiffs argue that the motion judge reached the wrong conclusion based upon the facts before him.
Plaintiffs do not dispute the motion judge's conclusion that the provision of subsidized housing for those with psychiatric disability does not, alone, qualify those properties for exemption from local property taxation. See Disability Res. Ctr./Atl. & Cape May, Inc. v. City of Somers Point, 371 N.J.Super. 1, 12, 851 A.2d 792 (App.Div.2004)("[A] facility that merely rents out dwellings to a disabled population is not entitled to an exemption.").
Instead, they argue that, because they operate an integrated program for their residents, one that includes housing combined with supportive and counseling services, the combined program meets the statutory requirements for a "charitable" exemption. While there is no dispute that the supportive and counseling services are actually provided, the municipalities asserted, and the motion judge determined, that the housing and services are not truly *849 integrated, as plaintiffs maintain, but are, in essence, separate programs coincidentally provided by the same entities.
The motion judge held that there had to be "some institutional aspect to the housing program" for it to qualify for the exemption. In finding that there was no such "institutional aspect," the judge relied upon two factors: first, the fact that a majority of the clients to whom Advance Housing provides supportive and counseling services do not live in housing owned by either plaintiff; and second, the fact that the residents of their properties are not contractually required to participate in the services provided by Advance Housing. He noted that, even though "all, or at least substantially all" clients do participate in the services, there was "no necessary link between residing in the housing and participating in the programs." He mentioned a third factor, the fact that some of the residents received services for a relatively brief period of time each week, but stated that he did not view it as "dispositive."
It is not clear what the judge meant when he referred to an "institutional aspect," a concept he did not explain. To the extent he meant that the services had to be provided in an "institutional setting," we disagree. He cited no statutory provision or case law for such a requirement. According to Martone's certification, an important purpose of supportive housing is to enable the de-institutionalization of those with mental health conditions who do not need to be housed in an institution, provided they can receive supportive services such as those offered by Advance Housing.
The first factor relied upon by the motion judge was the fact that most of Advance Housing's clients do not reside in properties owned by it or Advance 2000. While that is accurate, we see no legal basis for a requirement that the provider of an integrated housing and services program provide the supportive and counseling services component exclusively to its own tenants. The fact that Advance Housing provides supportive services to clients who reside in other housing does not of necessity mean that plaintiffs do not provide an integrated housing and services program to their own tenants. It simply means that Advance Housing is able to assist a wider population because its reach is not circumscribed by its own limited housing stock.
The judge's second reason, the fact that there is no requirement that residents participate in services, is of more concern, but not, in our view, determinative in this case. The statute itself, N.J.S.A. 54:4-3.6, conditions the general charitable exemption, in part, on how the building is "actually" used. The record before the motion judge, including extensive documents from Advance Housing managers and counselors, fully supports plaintiffs' assertion that all of the residents are "actually" receiving services. Defendants have not demonstrated otherwise, nor would we view the failure of a small number of residents to partake in services as dispositive.
We find the Tax Court's opinion in Cmty. Access Unlimited, Inc. v. City of Elizabeth, 21 N.J. Tax 604 (Tax 2003), particularly instructive in deciding this appeal. Like plaintiffs, Community Access owned residential properties and provided a variety of supportive services to those who resided there. Id. at 606-09. The rents never exceeded the fair market rent for similar properties in Elizabeth, but Community Access only charged its residents thirty percent of their income, with the remainder coming from other sources, including government programs. Id. at 608. It did not evict residents who *850 were unable to make their rent payments. Ibid. Like the municipal defendants in this case, the City of Elizabeth argued that Community Access was not entitled to an exemption under N.J.S.A. 54:4-3.6 because "the primary use of the[] properties [was] merely to house people with mental disabilities." Id. at 607. It also argued that the provision of services was "only ... a secondary purpose." Ibid.
After noting that the "determination of whether or not property is being used for a charitable purpose depends on the facts and circumstances of each case," id. at 613, the Tax Court judge thoroughly analyzed the facts in terms of the applicable law and prior cases such as Presbyterian Homes, Essex Properties Urban Renewal Associates, Inc. v. City of Newark, 20 N.J. Tax 360 (Tax 2002), which was relied upon by the motion judge in this case as well as defendants, and Salt & Light Co. v. Mount Holly Twp., 15 N.J. Tax 274 (Tax 1995), aff'd o.b., 16 N.J. Tax 40 (App.Div.1996), certif. denied, 148 N.J. 458, 690 A.2d 606 (1997), which is relied upon by plaintiffs. Cmty. Access, supra, 21 N.J. Tax at 613-17.
Following his review of the facts and the law, the judge reached the following conclusion:
Elizabeth contends that [Community Access]'s primary purpose is to house people with mental disabilities and any service it provides that may improve or rehabilitate its members is purely secondary. It appears to this court, however, that [Community Access] provides much more than just housing to its members residing at the subject properties. In fact, the court finds that the housing itself is secondary to [Community Access]'s main purpose, which is to give individuals incapable of functioning on their own an opportunity to live as close to a normal life as possible. [Community Access] argues that if not for the housing and social services it provides to its members, a public facility like Graystone Psychiatric Hospital would have to care for them at public expense.
The courts and the Legislature alike have recognized that rehabilitating the mentally disabled is an important and legitimate governmental concern. In Township of Washington v. Central Bergen Community Mental Health Center, Inc., 156 N.J.Super. 388, 419-420 [383 A.2d 1194] (Law Div.1978), the court observed that,
[s]tate concern in this area [of rehabilitating the mentally disabled] is amply demonstrated by the enactment of N.J.S.A. 30:9A-1 [to -28] wherein the Legislature has carefully charted a course directing vastly expanded programs to meet the needs of the less fortunate citizens who suffer from mental disabilities requiring care and treatment but not institutionalization.
[Community Access, supra, 21 N.J. Tax at 617-18.]
As a result, he concluded that "the manner in which the subject properties are actually and exclusively used is consistent with and in furtherance of [Community Access]'s stated charitable purpose" and, therefore, that the properties qualified for property tax exemption pursuant to N.J.S.A. 54:4-3.6. Id. at 618-19.
In Salt & Light Co., supra, 15 N.J. Tax at 277, the plaintiff sought an exemption from local property taxes because its properties were used for the charitable purpose of providing temporary housing and counseling services to the homeless. The defendant municipality maintained that the properties were taxable, largely because the plaintiff was compensated on a fee-for-service basis by the State of New Jersey. Ibid. The Tax Court judge held, and we affirmed on the basis of her opinion, that *851 the plaintiff used its facilities for a charitable purpose by providing temporary shelter and services to the homeless and that it was not operating for profit, and was therefore qualified for tax exemption under N.J.S.A. 54:4-3.6, even though it received government subsidies. Id. at 295-96. The judge explained that the plaintiff provided services to the homeless including those who could not afford to pay rent, did not evict residents who could not pay rent, and provided services that the private for-profit housing market did not provide.[4]Id. at 281, 295.
The facts in this case are distinguishable from those of Essex Properties, which turned primarily upon the dearth of facts submitted by the plaintiff in that case and the unspecified and minimal nature of services provided by a social worker on site. Here, plaintiffs presented certifications demonstrating that (1) all of its tenants received supportive services, (2) rent is set at a market rate for HUD purposes, but the portion clients pay is limited to one third of adjusted income, (3) no clients have been evicted for the failure to pay rent. The record here also includes plaintiffs' financial statements as well as detailed information about specific supportive services rendered to clients. Finally, the supportive housing provided by Advance Housing and Advance 2000 relieves the government of the burden of providing more costly housing and care for those with psychiatric disabilities, such as institutionalization, group homes, hospitalization, and, potentially, incarceration.
We agree with the motion judge to the extent he characterized his third factor, the variation in the amount of time spent providing supportive services to each client, as non-dispositive. Advance Housing has demonstrated that, although all of the residents in the properties at issue receive regular services, ranging from a daily to a weekly basis, the level of services is tailored to the specific needs of each client. No public policy would be served by requiring clients to receive unnecessary services. In addition, the record reflects that the services provided by Advance Housing are significantly greater than the vaguely-described social-work services in Essex Properties, supra, 20 N.J. Tax at 367.
Ridgefield Park and Fairview argue that, because plaintiffs receive fair market rent from a combination of the residents and government sources, they are operating as a for-profit entity. They also point out that the leases do not specifically limit each tenant's rent payment to thirty percent of adjusted income, but instead hold tenants responsible for the entire amount set forth in the lease. In addition, Ridgefield Park claims that plaintiffs have implemented a "shocking measure" to ensure continued payment of rent by seizing control of a resident's property by taking "legal action to become the representative payee" of a tenant to ensure that rent is paid.
Plaintiffs' evidence shows that they set a fair market rent for HUD purposes, but actually charge only thirty percent of their adjusted income. They have not held clients responsible for more than that amount.
Martone explained that all of plaintiffs' residents suffer from mental illness and are susceptible to psychiatric decomposition, which can lead to their failure to pay rent and other bills. In such cases, Advance Housing takes steps to restore *852 the client to psychiatric and financial equilibrium, which can include acting as a financial guardian until the resident is able to handle his or her affairs independently again. Actions such as seeking appointment of a financial guardian, even if they result in payment of rent, do not constitute operating as a for-profit entity. Ultimately, it is a form of supportive service that allows the client to remain out of an institution or avoid becoming homeless, and to return to independent living in the supportive environment provided by plaintiffs.
Based upon our review of the record and the applicable law, we conclude that plaintiffs have satisfied all three parts of the three-prong test set forth in Presbyterian Homes, supra, 55 N.J. at 283, 261 A.2d 143, because they are organized for the particular purpose for which the exemption is claimed, they operate on a non-profit basis, and the property is actually and exclusively used for the charitable activity. We also conclude that the integrated charitable program provided by the plaintiffs to those who live in the properties involved in this appeal is of the type the Legislature sought to benefit through the general "charitable" property tax exemption contained in N.J.S.A. 54:4-3.6. Consequently, we reverse the judgment of the Tax Court and remand for the entry of an appropriate judgment granting the property tax exemptions.
Reversed.
NOTES
[1] Plaintiffs continue to acquire additional housing units.
[2] Plaintiffs originally argued that the judge also erred in determining that they were not entitled to an exemption under the "feebleminded" provisions of N.J.S.A. 54:4-3.6. They withdrew that contention at oral argument.
[3] The statute was amended, effective November 14, 2010, to remove references to persons who are "feebleminded," "idiotic," or "mentally retarded" and replace them with references to persons who have "intellectual disabilities." See L. 2010, c. 50, Sec. 81. However, L. 2010, c. 50, Sec. 83 specifically provides that "[n]o change in terminology made pursuant to this act shall be construed as causing or intending any change in any definitions or meanings of any provision so changed."
[4] According to Martone, no other entity in Bergen County provides the same level of comprehensive services and Advance Housing does not compete with private, for-profit entities.