LYNN SHEPARD, PLAINTIFF-RESPONDENT, v. WOODLAND TOWNSHIP COMMITTEE AND PLANNING BOARD AND LARRY JONES, DEFENDANTS-RESPONDENTS, AND SUNNY PINE, INC., A/K/A CRESTWOOD VILLAGE, INC., DEFENDANTS-APPELLANTS.

Argued January 12, 1976—Decided September 28, 1976.

*Mr. Robert J. Partlow* argued the cause for appellant (*Messrs. Parker, McCay and Criscuolo,* attorneys; *Mr. Partlow* on the brief).

*Mr. Mark A. DeMarco* argued the cause for respondents Woodland Township Committee, et al. (*Messrs. Donis and DeMarco*, attorneys; *Mr. DeMarco* on the brief).

*Mr. Charles A. Little* argued the cause for respondent Shepard (*Messrs. Bleakly, Stockwell and Zink*, attorneys; *Mr. Little* and *Mr. Salvatore A. Alessi* on the brief).

*Messrs. Greenbaum, Greenbaum, Rowe and Smith* filed a brief on behalf of *amicus curiae* Manchester Communities Coordinating Council (*Mr. Arthur M. Greenbaum and Mr. Robert C. Schachter* on the brief).

*Messrs. Giordano and Halleran* filed a brief on behalf of *amicus curiae* Retirement Communities Council of the New Jersey Builders Association (*Mr. John J. Devincens* of counsel and on the brief; *Mr. Francis J. Badach* on the brief).

The opinion of the court was delivered by

PASHMAN, J. This is a companion case to *Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp.*, 71 *N. J.* 249 (1976), rev'g 125 *N. J. Super.* 376 (App. Div. 1973). It too concerns the validity and constitutionality of zoning for planned housing developments for the elderly.

I

The facts are essentially undisputed. In April 1973 the township committee of Woodland Township, Burlington County, amended certain sections of its zoning ordinance to permit "senior citizen communities" as a special use exception in a residential-agricultural district.

Section 601 of the municipal zoning ordinance was amended to provide:

Purpose. It is the purpose of this zone to preserve the open agricultural character of this section of the Township, and, at the same

time, provide an area for large lot residential development, *and/or Senior Citizen Communities*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[Amended portion italicized]

Section 603, which authorizes the zoning board of adjustment to permit certain "special uses" in that district with the approval of the township committee, was also amended to permit establishment of senior citizen communities as follows:

8. Senior Citizen Communities. In R–A Zones where one or more parcels of land having a contiguous area of at least 500 acres are under common ownership or control, there may be established a Senior Citizen Community in accordance with the laws of the State of New Jersey and with the following additional requirements:
a. Age and Occupancy Requirements. The permanent residents of a Senior Citizen Community shall be confined to persons who are 52 years of age or over except that one child who is 19 years of age or over may be permitted to reside in any senior citizen dwelling unit occupied by his or her parent(s) or guardian(s). Full time occupancy of any residential unit shall be limited to 3 individuals.

The remaining provisions of the amendatory ordinance prescribe the terms and conditions under which these communities are to be constructed and operated. They provide that senior citizen developments may include, as permissible uses, single-family dwellings, one-story attached dwellings (such as townhouses and apartments), limited commercial and service facilities "intended primarily for the use and convenience of the residents" and shopping centers as a "special permitted use." These amendments also require that developers furnish certain recreational and cultural facilities, including a clubhouse and recreational building, a shuffleboard court and a swimming pool. These facilities are intended for the sole benefit of community members and their guests. Finally, the amendatory ordinance contains detailed specifications concerning residential densities, green areas, maximum building coverage, set backs, minimum floor areas, roads and drainage, parking facilities, utilities,

sanitation, fire protection and protection of topsoil, trees, water courses and unique physical and historical landmarks.

In accordance with the procedures and standards established in the Woodland Township zoning ordinance, defendant Sunny Pine, Inc., a/k/a Crestwood Village, Inc. (hereinafter "Sunny Pine") submitted an application to the township zoning board of adjustment for a special use permit to construct a senior citizen community on a tract of land within the township. While the application was pending before the board, plaintiff, a resident of Woodland Township,[1] initiated this action challenging the amendatory ordinance as an improper exercise of the zoning power and as an unconstitutional provision.[2] The matter was heard on cross-motions for summary judgment.

The trial court in a reported opinion held that zoning for senior citizen communities "is not foreign to the authority granted to municipalities in the [zoning] enabling act." Nonetheless, the court found the specific age qualifications in the Woodland Township ordinance which restrict residency to persons 52 years of age and over to be "constitutionally impermissible." *Shepard v. Woodland Tp. Comm.*, 128 *N. J. Super.* 379, 384 (Ch. Div. 1974). The Appellate Division, with one judge dissenting, affirmed but modified the lower court decision. Relying on the Appellate Division decision in *Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., supra,* the court held that zoning for this type of planned housing does not constitute a valid exercise

---

[1]The standing of plaintiff to bring this action has not been challenged by any of the parties to this suit.

[2]In plaintiff's original complaint, there were several additional allegations, charging that the ordinance had not been enacted as originally intended by the township committee, that Sunny Pine's application for a special use permit was not in proper form and that the approval of Sunny Pine's site plan and building design was improper. Following a pretrial conference, these issues were abandoned, and the issues to be tried were limited to the question of the constitutionality of the ordinance and the jurisdiction of the court.

of the zoning power. Concluding that the Woodland Township amendatory ordinance was invalid in its entirety, the court found it unnecessary to determine the validity of the residence requirements. *Shepard v. Woodland Tp. Comm.*, 135 *N. J. Super.* 97 (App. Div. 1975).[3]

Defendant Sunny Pine appealed as of right. *R.* 2:2–1(a). Defendants Woodland Township Committee and Planning Board and Larry Jones, the township building inspector, declined to appeal but did file a respondent's brief pursuant to *R.* 2:6–4. Motions were granted to permit the Retirement Communities Council of the New Jersey Builders Association and the Manchester Communities Coordinating Council to file briefs as *amici curiae*.[4] The cause was

---

[3]While this litigation was pending, Sunny Pine's application for a special use permit was granted by the zoning board of adjustment and approved by the township committee. After the decision of the trial court, the township committee authorized Sunny Pine to proceed in accordance with its permit but imposed the additional condition that it include in its deeds restrictive covenants containing the same age limitations originally set forth in the amendatory ordinance. On appeal to this Court, plaintiff argues that, in light of the unconstitutionality of the Woodland Township ordinance, the use of covenants to restrict the sale of real property on the basis of age is also unconstitutional and hence unenforceable. *Cf. Shelley v. Kraemer*, 334 *U. S.* 1, 68 *S. Ct.* 836 92 *L. Ed.* 1161 (1947). In a supplemental brief Sunny Pine suggests that the senior citizen community in question "is not being constructed" and that "no such restrictive covenants . . . are in existence." Regardless whether these restrictive covenants are in existence, we find it unnecessary to reach the issue posed by plaintiff due to our determination that the Woodland Township ordinance and the age restrictions contained therein are themselves lawful and valid. We assume the Township will not enforce the condition as to the restrictive covenant.

[4]The New Jersey Builders Association is a nonprofit corporation created pursuant to *N. J. S. A.* 15:1–1 *et seq.* whose membership is comprised of builders, general contractors, building subcontractors, building tradesmen and suppliers, and persons, partnerships, corporations and other entities engaged in various aspects of the building industry in New Jersey. The Retirement Communities Council of the New Jersey Builders Association consists of seven corporate members of the Builders Association whose primary concern is the planning, development and construction of planned retirement com-

joined for argument before this Court with *Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., supra* (hereinafter *"Weymouth Tp."*).

## I

■ We first address the issue whether zoning for planned housing developments for the elderly constitutes a valid exercise of the municipal zoning power under the pertinent enabling legislation. *N. J. S. A.* 40:55–30 *et seq.*[5] In *Weymouth Tp., supra,* we resolved this question in the affirma-

---

munities for the elderly. *Amicus* informs us that almost all of the planned retirement communities which have been constructed by members of the Council have been planned and developed in accordance with municipal ordinances which restrict residency in the developments on the basis of age.

The Manchester Communities Coordinating Council is an organization comprised of approximately 20,000 elderly persons who reside in 12 senior citizen communities located throughout Ocean County, New Jersey. Residents of two other nonmember communities also requested that the Council represent their interests in this litigation. *Amicus* informs the Court that all of these communities were developed pursuant to zoning ordinances which substantially restrict residency to persons 52 years of age or older.

[5] We note here that the recently enacted "Municipal Land Use Law," *L.* 1975, *c.* 291, *N. J. S. A.* 40:55D–1 *et seq.,* which went into effect on August 1, 1976 and repeals the current zoning enabling act, *N. J. S. A.* 40:55–30 *et seq.,* may require the township to make substantial changes in its zoning ordinance. In particular, the new law may require modification of those provisions authorizing the establishment of senior citizen communities. *See Weymouth Tp., supra,* 71 *N. J.* at 249; *See, e. g., L.* 1975, *c.* 291, §§ 2(1) and 52(g) and Part IV of *Weymouth Tp.* However, for the reasons set forth in Part IV of *Weymouth Tp., supra,* 71 *N. J.* at 249, we conclude that the instant matter must be decided on the basis of preexisting law. This property owner, like the one in *Weymouth Tp.,* made an application for development prior to the effective date of the Municipal Land Use Law.

We further note that the Municipal Land Use Law allows municipalities to bring their ordinances into conformity with the new law within six months. *L.* 1975, *c.* 291, § 81(a). Accordingly, Woodland Township informs us that it has begun to draft a new master plan which will recommend amendments to conform its zoning scheme to the Municipal Land Use Law on or before February 1, 1977.

tive. There we held that a local regulation which authorizes the development of planned housing for the elderly is within the purview of the zoning power so long as it advances one of the several purposes set forth in the enabling statute and bears a real and substantial relationship to land use regulation within the community. *Id.*, 71 *N. J.* at 265, 277, 278.

## A

*N. J. S. A.* 40:55–32 provides that local zoning ordinances shall serve one or more of several enumerated purposes, including promotion of the general welfare.[6] As we have repeated on numerous occasions, the concept of the general welfare in the realm of land use regulation is broad and inclusive, and clearly encompasses the problems of housing and related needs. *Weymouth Tp., supra,* 71 *N. J.* at 264, 265; *Southern Burlington Cty. NAACP v. Mt. Laurel Tp., supra,* 67 *N. J.* at 175, 178–180; *DeSimone v. Greater Englewood Housing Corp. No. 1,* 56 *N. J.* 428, 440–42 (1970); *N. J. Mortgage Finance Agency v. McCrane,* 56 *N. J.* 414, 420 (1970) and cases cited; *Kunzler v. Hoffman,* 48 *N. J.* 277, 286–87 (1966). *Cf. Village of Belle Terre v. Boraas,* 416 *U. S.* 1, 6, 94 *S. Ct.* 1536, 39 *L. Ed.* 2d 797, 802 (1974); *Berman v. Parker,* 348 *U. S.* 26, 32–33, 75 *S. Ct.* 98, 99 *L. Ed.* 27, 37–38 (1954). In this regard, it also contemplates housing for *all categories of people* in both the community and the surrounding region. *Weymouth Tp., supra,* 71 *N. J.* at 276, n. 11 and accompanying text; *Southern Burlington Cty. NAACP v. Mt. Laurel Tp., supra,* 67 *N. J.* at 177–78; *Kunzler v. Hoffman, supra,* 48 *N. J.* at 287–88; *Roman Catholic Diocese of Newark v. Ho-Ho-Kus Borough,* 42 *N. J.* 556, 566 (1964); *Borough of Cresskill v. Borough of Dumont,* 15

---

[6]For parallel provision in the new Municipal Land Use Law, *see* L. 1975, *c.* 291 §§ 49, 52, 54, codified as *N. J. S. A.* 40:55D–62, 65, 67.

*N. J.* 238, 247–49 (1954); *Duffcon Concrete Products, Inc. v. Borough of Cresskill,* 1 *N. J.* 509 (1949).

In *Weymouth Tp.,* we reviewed in detail the special housing needs and requirements of older persons, the current shortage of suitable housing to meet those needs and the demographic trends which have aggravated this housing shortage. We need not repeat that discussion here. *See generally* 2 *White House Conference on Aging, Toward a National Policy on Aging* 29–36 (1971); *President's Task Force on Aging, Toward a Brighter Future for the Elderly* 38–40 (1970); *Hearings on Adequacy of Federal Response to Housing Needs of Older Americans Before the Subcomm. on Housing for the Elderly of the Senate Special Committee on Aging,* 92d Cong., 1st Sess., 2d Sess., 93rd Cong., 1st Sess., 2d Sess., pts. 1–12 (1972–74); *Hearings on Specialized Housing and Alternatives to Institutionalization Before a Subcomm. of the House Comm. on Government Operations,* 93d Cong., 2d Sess. (1974); Older Americans Act of 1965, 42 *U. S. C. A.* § 3001 *et seq.;* Senior Citizens Housing Act of 1962, 12 *U. S. C. A.* §§ 1701 q, 1701 r, 1701 s; *N. J. Office on Aging, Proceedings — Aging and Housing Conference* (1972); *N. J. Office on Aging, A Community Guide: Housing New Jersey's Elderly* (1971).[7] It is suf-

---

[7]However, the findings of the New Jersey Legislature in this regard do bear repeating:

It is hereby found and declared that there exists in various parts of this State a seriously inadequate supply of decent, safe and sanitary rental housing for elderly persons and elderly families in the lower middle-income brackets at rentals which said persons and families can afford; that this situation tends to cause serious social unrest; that the lack of properly constructed rental housing units designed specifically to meet the needs of the elderly of this state in the lower middle-income bracket at rentals which this class of elderly can afford constitutes a menace to the health, safety, welfare and morals of the public; that many elderly persons in this State are presently, in fact, displaced from adequate housing facilities by the presence of blighted areas and other areas rendered unsuitable because of lack of safe and sanitary conditions and facilities or by catastrophies which have destroyed their

ficient to observe that the Woodland Township ordinance is, in many respects, even more responsive to the special housing needs of the elderly than the zoning ordinances which we upheld in *Weymouth Tp., supra.*

The height and bedroom restrictions of the ordinance assure the construction of small, easily manageable, single-level units with a minimum of stairs and thereby reduce the need for climbing and unnecessary exertion. *N. J. Office on Aging, Proceedings — Aging and Housing Conference, supra* at 37–41; *N. J. Office on Aging, A Community Guide: Housing New Jersey's Elderly, supra* at 3. The mandatory provision of recreational facilities, such as clubhouses, a shuffleboard court and a swimming pool, directly addresses the need for increased social contact and leisure-oriented activities. The importance of providing elderly persons with easily accessible focal points of social contact is now well recognized. *See, e. g.,* K. Heintz, *Retirement Communities: For Adults Only* 3–4, 8 (Center for Urban Policy Research, Rutgers Univ. 1976) (soon to be published, hereinafter *"Retirement Communities"*); *Division on Aging, N. J. Dept. of State, Housing for an Aging Population* 22–23 (1962); *N. J. Office on Aging, Proceedings — Aging and Housing Conference, supra* at 36–39, 42.[8] More-

dwellings which have not been replaced because of adverse economic conditions; that the improvement of these conditions requires the erection of new dwellings and dwelling units at rentals which the elderly who need housing can afford; . . . that housing projects so erected and operated, are for the moral and mental improvement of men and women; that such housing for the elderly is a public purpose and public object worthy of the cooperation of the State, and the municipalities thereof; that the provisions hereinafter enacted are necessary to provide such housing, . . . and that the necessity in the public interest for the provisions hereinafter enacted is hereby declared as a matter of legislative determination.

[*N. J. S. A.* 55:14i–2]

[8] One commentator describes some of the ways in which retirement communities seek to meet this important need:

The physical design of a retirement community ... consists primarily of single-family attached and detached units facing cur-

over, by permitting the construction of a shopping center as a permissible use within the community, the ordinance provides developers with a financial incentive to build senior citizen communities. More importantly, it guarantees relatively easy access to shopping areas for the development's elderly residents. *See Div. on Aging, N. J. Dep't of State, Housing for an Aging Population, supra* at 22–23; *N. J. Office on Aging, The Impact of Retirement Communities: Summary Report* 20, 38 (1974). Finally, as was noted by a Presidential Task Force, retirement communities foster and facilitate the continued independence and self-sufficiency of their elderly residents:

The period of independence of older persons may be extended and the quality of their lives enhanced through provision of limited supportive services in apartments and villages designed especially for their use. Such services may include: congregate dining facili-

---

valinear and cul-de-sac roads. Houses are fairly close together, each has its own entrance to individual quarters. These design elements foster access to the community and satisfy a basic objective of the community setting for the elderly:

The more nearby the front walk and the entrance give access to individual quarters, the more free and comfortable the older person and his visitors will probably feel in leaving and entering. The present popularity of the motel type of structure among retired people is in part an indication of such preferences. One of the basic objectives for the group setting is the ordering of the environment in such a way as this that individual residents function as an integral part of community life.

In addition to appropriately locating dwelling units in relation to one another, the retirement community design incorporates a focal point for intracommunity activity, the need for which one architect makes clear:

Just as the general store with its pot bellied stove was a focus of yesterday's informal community contacts, so today there needs to be a focus for contact — cultural, recreational and social — in the group setting.

In the community at large, day centers and recreational and hobby centers are attempting to meet such need.

This focal point is usually a clubhouse or gathering place for daily social events within the retirement development.

[*Retirement Communities, supra* at 7–8; references omitted].

ties; social and recreation programs; provision for emergency nursing and housekeeping help; outside maintenance; information and counseling; and transportation to provide for residents ready access to community services and to enable them to participate as fully as they wish in community life.

[*President's Task Force on Aging, supra* at 38][9]

It is therefore not surprising that, according to *amicus* Manchester Communities Coordinating Council and other available sources, most residents of senior citizen villages have expressed satisfaction with this form of housing. *See, e. g., N. J. Office on Aging, The Impact of Retirement Communities: Summary Report, supra* at 42.

We note, incidentally, however, that senior citizen communities of the type contemplated by the Woodland Township ordinance primarily serve semi-affluent, professional or skilled retirees.[10] Therefore, unlike the ordinances sustained in *Weymouth Tp., supra,* the Woodland Township provisions do not respond directly to the needs of elderly persons in the lower and moderate income brackets. Nonetheless, by

---

[9]Another study makes the following comments:

A well-conceived housing environment for the elderly facilitates adaptation to the aging process by encouraging various stages of self-sufficiency.

At some point along the continuum, a stage of complete dependence may occur. However, only 4 percent of the population ever reaches this stage. In the main, the elderly prefer to live as *independently as they are able. With slight structural modifications* in the dwelling unit and with well-planned community design, even the disabled elderly are able to remain largely independent and to find "dignified and meaningful ways of life up through their old age."

[*Retirement Communities, supra* at 4; reference omitted].

[10]One recent study of five retirement communities in New Jersey concludes that "[t]he occupants of New Jersey retirement developments are typically Caucasian, retired, semi-affluent and between sixty-five and seventy-four years of age." *Retirement Communities, supra* at 17. The study further notes that while the national median income in 1974 for persons sixty-five and over was only $3,007, the median income for the survey group was approximately $12,000 per year. *Id.* at 19.

authorizing greater residential densities than are otherwise permitted in the district, the ordinances do allow the construction of dwelling units which are considerably cheaper than those with comparable amenities in other parts of the community. *Retirement Communities, supra* at 9. In addition, construction of senior citizen communities will indirectly increase the supply of housing for all income groups as more elderly citizens gravitate towards retirement communities. For example, as middle and upper income persons leave their former homes for retirement communities, more housing will become available for elderly persons with lower incomes and for young and growing families in need of larger homes. *N. J. Office on Aging, A Community Guide: Housing New Jersey's Elderly, supra* at 1.

For all the foregoing reasons, we are satisfied that the Woodland Township ordinance serves the peculiar housing needs of the elderly by authorizing the construction of specially-designed housing for this segment of the population. In so doing, it clearly promotes the general welfare of both the township and the region at large. We further note that the ordinance is intended to provide housing for a specific category of people and is not intended to preclude other classes of people from residing within the municipality.[11]

### B.

In addition to furthering one of the purposes of the enabling act, a municipal zoning ordinance must bear a real and substantial relationship to regulation of land use to survive legal challenge. *Weymouth Tp., supra,* 71 *N. J.* at 265, 277, 278; *Bridge Park Co. v. Highland Park,* 113 *N. J. Super.* 219 (App. Div. 1971); *Garden State Farms, Inc. v. Bay,* 136 *N. J. Super.* 1, 20–21 (Law Div. 1975); *cf. Kirsch Holding Co. v. Manasquan,* 59 *N. J.*

---

[11]We postpone consideration of the possible exclusionary effects of the ordinance until Part **IV,** *infra.*

241, 249–51 (1971); *see generally, Schmidt v. Newark Bd. of Adjustment,* 9 *N. J.* 405, 416, 418 (1952).

As Judge Handler, the dissenting judge in the Appellate Division correctly noted, both the trial court and the majority of the Appellate Division found the age and occupancy qualifications to be the Achilles heel of this ordinance. Section 8(a) of the ordinance restricts permanent residency in senior citizen communities to persons who are at least 52 years old (except that one child who is 19 years of age or older may reside with his parents or guardians). Section 8(a) further limits fulltime occupancy of any dwelling unit to no more than three individuals. In asking us to strike these provisions, plaintiff would have us adopt a rigid and inflexible rule invalidating all municipal ordinances which, in any way, transcend regulation of the *physical* and *structural* aspects of land use and which collaterally regulate those who may use the land. We decline to adopt such a narrow view of the zoning power.

As we stated in *Weymouth Tp., supra,* regulation of the use of land cannot, as a conceptual matter, be dissociated from regulation of the users of land. *Id.,* 71 *N. J.* at 277; *accord, Maldini v. Ambro,* 36 *N. Y.* 2d 481, 487, 369 *N. Y. S.* 2d 385, 391–92, 330 *N. E.* 2d 403, 407–08 (Ct. App. 1975), appeal dismissed, 423 *U. S.* 993, 96 *S. Ct.* 419, 46 *L. Ed.* 2d 367 (1975); *contra. Hinman v. Planning & Zoning Comm'n,* 26 *Conn. Supp.* 125, 214 *A.* 3d 131 (C. P. 1965). We are also mindful of the pronouncement by the United States Supreme Court in *Euclid v. Ambler Realty Co.,* 272 *U. S.* 365, 47 *S. Ct.* 114, 71 *L. Ed.* 303 (1926) that, "[t]he line which in this field separates the legitimate from the illegitimate assumption of power is not capable of precise delimitation. It varies with circumstances and conditions." 272 *U. S.* at 387, 47 *S. Ct.* at 118, 71 *L. Ed.* at 310. Thus, when faced with a similar contention in *Weymouth Tp., supra,* we held that ordinances which regulate use by regulating the identified user are not inherently objectionable so long as the distinctions which they draw are

reasonable and the conditions they impose bear a real and substantial relationship to regulation of land use. *Id.* 71 *N. J.* at 278, 279.

Like the municipal regulations sustained in *Weymouth Tp., supra,* we have no doubt that the age and occupancy requirements of the Woodland Township ordinance fully satisfy these criteria. As Judge Handler correctly observed in his dissenting opinion: "While there may be other techniques or approaches for defining the composition of a community to consist of older persons, certainly age as a criterion is logical and conducive toward attaining the end sought." 135 *N. J. Super.* at 105. The necessity for age restrictions for senior citizen communities is both apparent and fully understandable. One commentator writes:

> The age restrictions serve to define a resident population which is essentially age homogeneous. In so doing, retirement villages maximize opportunities for the elderly to establish peer contact while providing a quieter environment than that normally available in non-age-segregated communities. The age-segregated environment is recognized as having a positive influence on the physical and mental well-being of the elderly by minimizing "the distress generated by a heterogeneous milieu."
>
> Aside from being less stressful, the age-segregated environment of communities such as the retirement also increases the probability of developing more social bonds and improved morale among the elderly. One expert in gerontology, Irving Rosow, has noted:
>
>> Friendship and socializing with neighbors, especially among the most socially dependent older people, were clearly consequential for morale. The number of old people's local friends does vary with the proportion of old neighbors, and these friends are basically drawn from older neighbors. The common assumption that residential proximity readily stimulates friendship between the generations is not borne out by the facts. . . . The number of old people's local friends varies directly with the proportion of age peers.
>>
>> [*Retirement Communities, supra* at 6–7; citations omitted].

The chairman of *amicus* Manchester Communities Coordinating Council, himself a member of a senior citizen community, offers the following additional observations:

The senior citizen communities in which members of the Council reside have been specifically designed and planned for the special needs and necessities of older persons. Substantial emphasis is placed upon community and recreational halls where activities such as dances, talent shows, bazaars, . . . take place.

&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;

Residing in a community with neighbors of similar age and outlook affords us a life of dignity, peace, tranquility, and harmony. Neighbors depend upon one another, and a genuine sense of friendship, interdependence, and congeniality prevails.

&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;

To open the doors of our retirement communities to all persons regardless of age would be to destroy that which so many of us have worked so long and hard to achieve. Many of the members of the Council receive fixed incomes from sources such as Social Security, retirement and pension funds. The financial aspects and framework of our communities and the municipalities in which they are located have been adapted to the costs and economics of senior citizens, and any substantive change in the character of the occupants thereof would undoubtedly destroy the socio-economic environment which has been so carefully created, thus resulting in irrevocable damage to and disruption of our lives.

[Affidavit presented to the Court by Alvin Reufer, chairman of the Manchester Communities Coordinating Council].

It is thus obvious that age restrictions are both rationally related to the concept of planned housing for the elderly and essential to the success of such developments. For these reasons, we fully agree with Judge Handler's assessment of the Woodland Township ordinance:

This ordinance thus represents a comprehensive scheme for the regulation of the physical use of land. It is comparable in overall design to several ordinances for senior citizens communities, copies of which were made available through the New Jersey State League of Municipalities. Such ordinances have been enacted and senior citizen community developments presently exist in several municipalities. It is the evident purpose of these municipal enactments and that of the Woodland Township ordinance, to regulate and control in a comprehensive fashion the physical use of land, molded to the objective that a special type of community or neighborhood will thereby be established and evolve with qualitative characteristics uniquely related to a style of life appropriate for older persons.

&ast;&ast;&ast;&ast;&ast;&ast;&ast;&ast;

While the age limitation of 52 years has been utilized in the Woodland Township zoning ordinance as a basis for residency within

the senior citizen community, that limitation is only one of a matrix of provisions for the regulation of the use of land and is related functionally to the establishment of a neighborhood suitable for older persons. . . . To iterate, occupancy qualifications according to age is only one aspect of a comprehensive scheme for land use development.

[135 *N. J. Super.* at 103–104].

*Cf. Village of Belle Terre v. Boraas, supra,* 416 *U. S.* 1, 94 *S. Ct.* 1536, 39 *L. Ed.* 2d 797. Thus, we find the Woodland Township amendatory ordinance to be a proper exercise of the zoning power.

### III

Plaintiff also challenges the Woodland Township ordinance on substantive due process and equal protection grounds. Similar challenges to almost identical age classifications were considered in our *Weymouth Tp.* decision.

There, we noted that the equal protection and due process clauses do not require government to treat all persons identically. Rather, they require only that differences in treatment must not be arbitrary or invidious, and that distinctions must be justified by an appropriate state interest and bear a real and substantial relationship to furthering governmental ends. *Id.,* 71 *N. J.* at 281, 282. The same considerations which warranted our conclusion that the Woodland Township ordinance advances a legitimate purpose of the zoning power and bears a real and substantial relationship to land use regulation also supports the conclusion that the requirements of substantive due process and equal protection of the law have not been offended.

Naturally, if the classifications were arbitrary, unjustified by a legitimate state purpose or based upon a suspect criterion, the ordinance would surely fall. *See, e. g., Buchanan v. Warley,* 245 *U. S.* 60, 38 *S. Ct.* 16, 62 *L. Ed.* 149 (1917). We are satisfied, however, that this is not the case here. Permission to develop age homogeneous communities as a possible use in a multifaceted community is

a legislative judgment which should not be disturbed by this Court unless clearly violative of constitutional principles. In this regard, we heed the warning of a leading commentator on the subject of land use planning:

. . . . land use decisions often have major social consequences, and these latter are often quite as important as their physical impact; they may in fact be more important. It is completely unrealistic, and in fact a little absurd, to try to insist that, in making such decisions, public officials should ignore such consequences; they will quite reasonably point out that it is their responsibility to take them into account. . . . *Again, it is a major question to decide whether the aged should live in special segregated areas, or scattered among the general population; a decision on this is likely to be phrased in terms of a land-use decision. Why should the courts invoke judge-made policy to preclude responsible local officials from implementing such policies?*

[Williams, *American Planning Law: Land Use and the Police Power*, § 1.11 at 22 (1974) (emphasis supplied)]

## IV

One final point concerning the possible exclusionary effect of zoning for the elderly warrants consideration.[12] We wish to emphasize, as we did in *Weymouth Tp., supra,* that while zoning for planned housing developments for the elderly clearly serves a salutary and legitimate nonexclusionary purpose, it will not be tolerated in cases where it contributes to an overall pattern of improper exclusion by the municipality, in violation of the precepts of *Mt. Laurel. See, e. g., Southern Burlington Cty. NAACP v. Mt. Laurel Tp., supra,* 67 *N. J.* at 168–69; *Schere v. Freehold Tp.,* 119 *N. J. Super.* 433, 437 (App. Div. 1972), certif. den., 62 *N. J.* 69 (1972), *cert. den.,* 410 *U S.* 931, 93 *S. Ct.* 1374, 35 *L. Ed.* 2d 593 (1973). Since plaintiff did not try the instant case on this ground, we have no occasion to decide

---

[12]The potential for using this type of land use regulation for improper exclusionary purposes was fully discussed in *Weymouth Tp., supra,* 71 *N. J.* at 290, 291 and need not be repeated here.

whether the Woodland Township amendatory ordinance would withstand such a challenge. We reverse the judgment of the Appellate Division and remand for entry of an order granting summary judgment for defendants.

*For reversal and remandment*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—7.                    *

*For affirmance*—None.