156 N.J. Super. 388 (1978)
383 A.2d 1194
TOWNSHIP OF WASHINGTON, A MUNICIPAL CORPORATION, PLAINTIFF,
v.
CENTRAL BERGEN COMMUNITY MENTAL HEALTH CENTER, INC., A NONPROFIT CORPORATION, AND BARBARA RUHREN, AND THE STATE OF NEW JERSEY, DEPARTMENT OF INSTITUTIONS AND AGENCIES, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided January 4, 1978.
*394 Mr. Leonard Adler for plaintiff.
Mr. Richard A. Kurland for defendants (Messrs. Stein & Kurland, attorneys).
Mr. William F. Hyland, Attorney General of New Jersey, for defendant intervenor (Mr. Alan B. Rothstein, Deputy Attorney General, of counsel and on the brief).
FOLLENDER, J.D.C., temporarily assigned.
In this declaratory judgment action brought pursuant to the provisions of N.J.S.A. 2A:16-50, plaintiff Township of Washington (township) seeks an adjudication to oust and foreclose defendant Central Bergen Community Mental Health Center, Inc. (Central) from its use and occupancy of certain residential premises commonly known as 866 Crest Place, as tenant under a written lease agreement in which defendant Barbara Ruhren (Ruhren) is landlord, on the ground that the de facto use and occupation of the premises in a "B" residential zone by five former mental patients at Greystone Park State Hospital (Greystone) under auspices of Central, is prohibited by the township zoning ordinance from which a variance has neither been sought nor obtained.
*395 Underlying and inextricably woven into the fabric of this controversy are the unexpressed but patently recognizable fears of local residents that as a result of Central's use they will suffer immediate and irreparable loss of property values, and that the occupants pose a threat to the community and themselves, thereby placing an unfair and undue burden on the township, which requires this court to order termination of the use.
By way of answer and counterclaim Central denies that its use and occupancy of the premises are prohibited or at variance with the zoning ordinance, and asserts in any event: that (1) it is entitled to governmental immunity from the application of the zoning ordinance bottomed on an existing contractual relationship between Central and the Department of Institutions and Agencies (now the Department of Human Services), an arm of the government of the State of New Jersey (State) forged pursuant to the legislative scheme set forth in N.J.S.A. 30:9A-1 et seq., and (2) the zoning ordinance is unconstitutional because it fatally conflicts with provisions contained in N.J.S.A. 30:9A-1.
Drawn by the public interest questions herein implicated, the State intervened as a party defendant. Relying upon the doctrine of sovereign immunity, the State urges that Central as its agent is performing an authorized function in its behalf and hence is not subject to the local zoning ordinances.
A recounting of the pertinent facts, which fortuitously are substantially undisputed, and of Central's operations and programs, is essential to a thorough understanding of the issues.
Washington Township is a suburban community located in the north-central portion of Bergen County known as the Pascack Valley, having a land area of approximately 3 1/2 square miles. Development of the available land area in the municipality exceeds 95% and is composed almost exclusively *396 of one-family residential dwellings of recent vintage, ranging in value from $35,000 to amounts exceeding $100,000. Industrial uses are prohibited in the township and there are no multi-family dwellings other than a few two-family homes. Commercial development is slight and includes a small number of retail service businesses of various types and one medium-sized shopping center.
Central, a nonprofit corporation, was incorporated under the provisions of N.J.S.A. 15:1-1 et seq., the Corporations and Associations Not For Profit Act, on July 30, 1970, by the filing of a certificate of incorporation pursuant to N.J.S.A. 15:1-15, for the purpose of providing mental health care and service by contract pursuant to a plan designed by the Legislature and embodied in N.J.S.A. 30:9A-1 et seq. Central commenced operations on August 1, 1971 as an independent community mental health center to serve the then 65,000 (now 160,000) people residing or working in the ten municipalities located in central Bergen County which comprise an area known as Catchment Area No. 46.[1] The number of persons employed by Central total between 75 and 100. Its principal offices for business are located at 18 and 26 Park Place, Paramus, New Jersey, with the latter site serving primarily as the headquarters for the program known as Project Haven. A satellite office is maintained in Saddle Brook, with affiliate facilities at Fair Lawn Mental Health Center and the Pascack Mental Health Center, and an inpatient component at Bergen Pines County Hospital (Bergen Pines).
*397 Over the years Central has devised, operated and expanded several programs for patients and former patients who would otherwise be confined at either Bergen Pines or Greystone. Among the services provided are hospital liaison programs, including "outreach" and pre-discharge planning; partial hospitalization; day treatment, vocational training and rehabilitation; offsite services provided to clients living in nursing homes; transportation to and from facilities, and assistance in arranging for necessary medical and dental care. Almost all of these services are offered to ex-patients of state or county institutions while housed in "transitional residences" established by Central under the combined program known as Project Haven. A "transitional residence" is one in which the individuals who may have been confined in an institutional environment for several years or longer are given the opportunity to learn or relearn noninstitutional interpersonal and community relationships. It is the core of Project Haven.
The ultimate goal of Project Haven manifest in its two-part program  residential living conjoined with rehabilitative treatment and training  is complete release into free society. Substantial factors controlling such release are financial independence, suitable housing facilities and the availability of a means of support within the community.
Project Haven-type residential facilities were first initiated by Central in 1972 in cooperation with the Bergen County Mental Health Board Committee on Continuity of Care. Greystone had become so overcrowded that a number of Bergen County residents were necessarily placed in foster homes in Morris County. Convinced of the urgency of the situation, the Bergen County Mental Health Board awarded a $10,000 grant to Central to open a transitional residence to serve selected patients who were classified as borderline between in-an-out patient status. During 1972 and 1973 Central opened two additional apartment-type residences, one for males and one for females.
*398 Commencing in 1975 states that had devised a master mental health plan which included a program for "transitional" services could receive federal funding for such services, pursuant to the federal Health Review Sharing Act of 1975, Title III, Public Law 94-63, and the federal regulations pertaining thereto. See, specifically, 42 U.S.C.A. § 2684.
The statutory scheme promulgated by the Legislature, effective June 12, 1967, contained in N.J.S.A. 30:9A-1 et seq., effectively qualified this State for such funding and provided in pertinent part the following:

N.J.S.A. 30:9A-1

It is declared to be the public policy of this State to encourage the development of preventive treatment and after-care services for mental health problems through additional community mental health programs and the improvement and expansion of existing community mental health services in designated service areas for the entire State which will provide these elements of adequate services:
* * * * * * * *
(b) out-patient services;
(c) partial hospitalization services such as day care, night care, weekend care;
* * * * * * * *
(g) rehabilitative services including vocational and education programs;
(h) pre-care and after-care services in the community including foster home placement, home visiting and halfway houses;

(i) training;
* * * * * * * *

N.J.S.A. 30:9A-5
Subject to the provisions of this chapter, and the regulations of the department, every county mental health board shall have the power and duty to:
(a) Develop a plan of community mental health services for the county;
* * * * * * * *

N.J.S.A. 30:9A-6
* * * * * * * *
(b) All projects shall include an explanation of the operation proposed and a budget showing all sources of revenue, including anticipated State financial aid, and a list of personnel requirements.

*399 N.J.S.A. 30:9A-8
The commissioner, with due regard for the recommendations made by the community mental health board, shall approve for State financial participation community mental health projects ... which implement ... a community mental health program through ... rehabilitative and after-care services for mental health problems of children and adults in the community.
* * * * * * * *

N.J.S.A. 30:9A-11

It is declared to be the policy of this State to encourage sponsoring agencies as described herein to establish community mental health centers by making provision for payment of a part of the cost of capital expenditures required in connection therewith, exclusive of the cost of site acquisition, and upon approval by the commissioner of a proper application by a sponsoring agency for this purpose a financial grant-in-aid may be made not to exceed 60% of that portion of the cost of said capital expenditures to be borne by said agency. [Emphasis supplied]
Said plan also complied with the Community Mental Health Center Act of 1973 (Title II of Public Law 89-105, 1966, and Public Law 91-211, 1970).
To further the strong public policy declarations and evident legislative intent contained in N.J.S.A. 30:9A-1 et seq., Central, at the request of the Board of Chosen Freeholders of Bergen County, submitted a program plan containing proposals for after-care services. Predicated upon the proposed submission, Central on March 1, 1975 executed a contract with the Office of Community Mental Health and Services of the Department of Institutions and Agencies (now the Office of Community Services of the Department of Human Services) to provide among other things, placement and work-related services, adult day care and counseling for 100 persons from Greystone, Bergen Pines and the community. The contract covered the period from March 1, 1975 to June 30, 1976. Additionally, it provided that a maximum of ten new transitional residences be established to house at least 50 catchment area residents, who, at the time, were ready for release from Greystone, and at least ten such persons from Bergen Pines. The deinstitutionalization program provided for in the contract subsequently became known as Project *400 Haven. Under the contract nine new transitional residences located in the catchment area were opened to supplement the two previously established. Altogether these residences housed 52 people during the contract year.
The contract was renewed on September 2, 1976 (although two interim contracts were required to bridge the gap caused by a dispute over budgetary matters), and provided for an expiration date of June 2, 1977. Both agreements complied with the provisions relating to mental health care set forth in the federal Social Security Act entitling the services provided to be funded directly through a federal fund-matching program for transitional residences. See Title II of the act. This agreement removed the limitation on the number of transitional residential units, providing only that "small" residences be established.
As of January 1977 there were 26 programs similar in kind and scope to Project Haven, operating in 37 communities throughout New Jersey, each offering transitional services. The Department of Human Services had entered into agreements with mental health organizations in 14 counties: Atlantic, Bergen, Burlington, Camden, Cumberland, Essex, Hudson, Mercer, Middlesex, Monmouth, Morris, Ocean, Passaic and Somerset. The contemplated total number of persons to be served was 388, but services were actually provided for only 224 due to difficulties in establishing appropriate transitional facilities.
At present there are 17 transitional residences located in Bergen County. Under the banner of Project Haven, Central operates 11 of these residences in seven of the ten municipalities situated in Catchment Area No. 46. These include six for women  that at 866 Crest Place, Washington Township (which is the subject matter of this litigation), one each in Park Ridge, Saddle Brook and Fair Lawn, and two each in Paramus and Westwood. Of the residences in Westwood one is a two-family home and the other a three-bedroom apartment. All other residences are single-family homes located in residential districts, with the exception of *401 that in Fair Lawn which is situated in a commercial/residential zone. Each residence is occupied by four to five persons, almost all of whom are releasees from either Greystone or Bergen Pines.
Project Haven is subsidized, to a small extent, by rent revenues received from clients housed in transitional residences at an average rate of $100 a month per resident. The total funds received from state and federal sources by Central, $72,789, to administer the program to 111 patients (at a unit cost of $655.75 per client) equals the annual cost of operation of the transitional facilities, while the total annual cost of maintaining a person at a Project Haven transitional residence is approximately $4,500. In order to maintain the same person for a like period at one of its institutions the State would have to expend an astounding $18,500, and even at that figure there is a great risk of loss of accreditation and the consequential loss to the State of several million dollars in federal funding because of the inadequate Greystone facilities. Having in mind that the only existing alternative available to ex-patients participating in the Project is return to state institutions, the value of Project Haven is readily apparent.
Available statistical data demonstrates that Central's activities have already had a significant impact in decreasing the number of patients being admitted to state institutions. The hospitalization rate at Bergen Pines for psychiatric patients from Catchment Area No. 46 averaged approximately 330 patients a year (25 to 30 a month) in the years 1972 through 1974; prior thereto the average had hovered around 400 admissions annually. The admission rate at Greystone averaged 70 patients a year from the area in 1969 and 1970, but as of 1974 and thereafter, fewer than ten patients a year required admittance to that facility.
The residence at 866 Crest Place is a one-story, raised ranch-type dwelling erected in 1968, containing two bedrooms, a living room, a dining room and 8' x 13' pullman-type *402 kitchen, a master bathroom and an unfinished basement in which are located a half-bath and a one-car garage. It is located on an undersized and nonconforming plot in a "B" residential zone.[2] (a variance was obtained to permit construction of the dwelling), which fronts Pascack Road directly across from 5 1/2 vacant acres situated in an O-R zone and within 500' of a nonconforming office building situated in the "B" zone. Other permitted uses in the zone are funeral parlors, beauty and barber shops, kennels, stables and riding academies. Prohibited uses in this zone include hospitals and nursing homes which are permitted in the office and research zone (O-R).
Central leased the premises on October 15, 1975 from Ruhren, "for use as a transitional home for mental health patients and related mental health uses," and notified the mayor and council on November 5, 1975 that it was about to open an after-care residence pursuant to its contract with the State. On November 18, 1975 the governing body directed the building inspector, Patrick Marrone, to investigate whether the projected use was permissible in the zone. On November 22, 1975 Marrone requested from Central a copy of its lease, an outline of Central's day-to-day operation, the number of employees in the premises, a floor plan showing proposed additions or alterations, if any, and a copy of Central's contract with the State. Central supplied the requested information by letter on November 26, 1975.[3] Interpreting *403 Central's correspondence as an application for a use and occupancy permit, Marrone denied the "application" by letter dated December 2, 1975.
On February 3, 1976 Marrone, accompanied by a municipal policeman, visited the residence and found that the premises were then occupied by three women and a social worker. On the basis of his investigation Marrone again denied the "application" of Central because he believed the use to be "quasi-institutional" and prohibited in a "B" zone. He cited three reasons as the basis for his determination: (1) Central, the tenant, did not itself reside in the premises; (2) Central provided 24-hour supervision to the occupants, which was suggestive of a clinic-type atmosphere, and (3) as described in the lease, the use as a "transitional home for mental health patients and related use" was prohibited in the "B" residential zone.
On February 6, 1976, although no complaints against Central for violation of the zoning ordinance had ever been made, the governing body of Washington Township instituted the present action.
Marrone testified that a transitional residential use was permissible in the O-R zone under existing provisions of the township ordinance. He also recalled that a prior application by Central for a variance, involving premises located in close proximity to 866 Crest Place, had been denied by the board of adjustment which subsequently granted a variance for use by an attorney and a doctor. Somewhat surprisingly, Marrone stated that had the occupants themselves actually leased the premises instead of Central, he *404 would not have considered the present use and occupancy a violation of the zoning ordinance.
Robert Kren, a professional planner employed by the township, concurred with Marrone, but he admitted that his opinion was based upon the personal characteristics of the residents and not on the use involved.
Thomas P. Martin, Records Officer of the Township Police Department, said that for the period from November 1976 to February 1977 he had received 10 or 12 letters written by a resident at 866 Crest Place, but was unable to report any activity or condition in the premises which required policy intervention.
Susan Joan Funke, a Central social worker, testified that five women now reside at 866 Crest Place, each of whom is a dischargee from Greystone. The length of stay of each resident is indefinite, generally a year or more, and certain residents indicate that they would like to remain for the balance of their lives. Should a resident exhibit any aberrational or psychotic behavior, that person is returned forthwith to an institution for further treatment. Final separation from the residence to the community is determined by the degree of independence achieved by an individual in terms of financial ability, work habits, productivity levels, available housing accommodations and social orientation to community standards. In addition to paying a proportionate share of the rent, the occupants are expected to purchase their own food, household goods and other necessaries on a pooled or individual basis, and to perform the usual household chores, such as cleaning, washing, cooking and personal care. Under Central's work-training program, which provides a minimum hourly wage, residents may earn funds to be applied to their contribution to household expenses, and which charges may be further defrayed by supplements available to them from state or federal sources.
Funke explained that occupancy at the residence is an elective joint decision. Central's staff makes a recommendation *405 to one who, by predetermination, is thought to be qualified for the residence, after which that person is free to accept or decline the offer. No one is placed at the residence by a court order and no person being of such an age or condition as would ordinarily necessitate nursing home-type care is eligible for placement in the residence. Also, prior conviction of a crime serves as a complete bar to eligibility for placement in the premises. Following placement, the resident's adjustment progress is reviewed quarterly by the staff. A resident is free to receive visitors and guests, to make a room change, to live alone (at a slightly increased rental fee), to pool funds for food and household needs or to act individually. Central has made no changes or alterations inside or outside of the structure or of the grounds to accommodate the use. To one not conversant with the present use there is nothing about the premises which might suggest an institutional, hospital or clinic-type use, and the residence outwardly appears to be similar in kind, character, quality and usage with those homes in the neighborhood.
Funke's testimony further revealed that Central provides assistance to residents in the form of one full-time and one part-time social service aide, whose salary is paid partially through state funds. The aides are not medical technicians and their only special training consists of one month of orientation relative to problems which might be encountered on the job. They do not render any treatment at the residence or teach any planned cooking or cleaning courses. Their services are simply supportive. Initially, they act as supervisors on a 24-hour basis; however, as the residents become more self-reliant, the aides assume the role of catalysts. By the time of trial the work schedule of the aides at the residence had been reduced to a weekly total of 35 hours (from 3 P.M. to 10 P.M. weekdays and during the daylight hours on weekends), a result directly related to the increasing acclimation to accepted societal conditions and independence of the residents. Central also maintains a *406 24-hour-a day back-up or crisis service which is available through telephone communication.
Francis W. Bailey, Project Director of Project Haven, testified that institutional living does not lend itself to the personal growth which can be obtained in a community-type setting provided by a transitional residence. Bailey stated that the role played by the transitional residence in the lives of its occupants is passive as contrasted to the activist stance employed by Central at its facilities in Paramus where therapeutic treatment is administered and vocational training and rehabilitative programs are provided. Bailey and Richard L. Miller, a coordinator for the New Jersey Division of Mental Health and Hospitals, agreed that in order for a transitional residence to be effective it must be located in an area common to the mainstream of community residential life; that forceful location of a residence in an O-R zone as suggested by the township would thwart the fundamental goals of the entire program (which are deinstitutionalization and independent reentry into society) and is contraindicated, because an O-R zone by design lacks essential residential characteristics vital to the success of the total undertaking.

I. The claim of immunity by Central from the zoning ordinance.

The contention of defendants that Central is immune from the provisions of the zoning ordinance is without merit. While it is well settled that, in the absence of a statutory waiver, state agencies are generally immune from the provisions of a municipal zoning ordinance, Berger v. State, 71 N.J. 206, 218 (1976); Rutgers v. Piluso, 60 N.J. 142, 153 (1972); see, generally, 2 Anderson, American Law of Zoning § 9.06 (1968); Note: "Governmental Immunity from Local Zoning Ordinances", 84 Harv. L. Rev. 869 (1971), subject to the limitation that even where such immunity is found to exist it must be exercised in a reasonable manner so as not to arbitrarily override legitimate *407 local interests, Washington Tp. v. Ridgewood, 25 N.J. 578, 584-586 (1958), a finding of immunity can only be determined by construing the legislative intent. Berger v. State[4] and Rutgers v. Piluso, supra. The test requires a searching examination into the nature and scope of the "instrumentality seeking immunity," Rutgers v. Piluso, supra, 60 N.J. at 153. The word "instrumentality" applies only to the State and its lesser governmental units, Rutgers v. Piluso, supra, and the doctrine of immunity cannot be invoked by one not a governmental agency, Carroll v. Jersey City Bd. of Adj., 15 N.J. Super. 363, 367 (App. Div. 1951); Thanet Corp. v. Princeton Tp. Bd. of Adj., 108 N.J. Super. 65, 71 (App. Div. 1969) (dissenting opinion). In the present case a private owner of residential real property  defendant Ruhren, as landlord  leased the premises located at 866 Crest Place to another private party  defendant Central, as tenant, and the sole link between Central and the State is a relationship founded on a contract freely and voluntarily concluded, which relationship may just as freely be dissolved by either party at will.
Under the circumstances this court finds that Central lacks the essential indicia common to a state agency or lesser governmental unit: it was organized as a private nonprofit *408 corporation; has exercised sole control in the hiring and firing of personnel and payment of their compensation, although, through an intricate scheme, funds flow to Central from the State directly and from the Federal Government indirectly, thus mandating certain regulatory procedures; a significant portion of Central's annual budget needs are met by traditional, nonpublic, fundraising techniques; it lacks the power of eminent domain, and finally and most importantly, in the event of a nonsoluable contract dispute, the State is free to select and engage another entity of its own choosing to carry out the function and programs theretofore conducted by Central,[5] without regard to the prior relationship between the parties.
Nor can defendants find any support for their position in the enabling legislation provided in N.J.S.A. 30:9A-1 et seq. The statute, while articulating the paramount and urgent concern of the State in the area of mental health care and rehabilitation by declaring that it is "the public policy of the State to encourage the development * * * of after-care services for mental health problems" and offering various services, including "(h) pre-care and after-care services in the community, including foster home placement, home visitation and half-way houses," (N.J.S.A. 30:9A-1 (h)), falls far short of expressly granting immunity to a private sponsoring agency from the application of municipal zoning ordinance or, in the alternative, conferring upon it *409 governmental entity status. Lacking an express legislative grant of immunity, this court is not empowered to create such immunity under the guise of a delegation of legislative authority on behalf of a nongovernmental agency. Paramus v. Martin Paint Store, 121 N.J. Super. 595, 600, (Law Div. 1972). Whether statutory law adequately delegates authority to deal with current local problems is a matter solely for legislative determination. This view was succinctly stated by our Supreme Court in Two Guys from Harrison, Inc. v. Furman, 32 N.J. 199, 229 (1960): "It is worth repeating that the Judiciary is not concerned with the good sense of a statute. Policy matters are the exclusive responsibility of the legislative branch of government * * *."

II. Validity of the zoning ordinance.

Now we focus on the three-pronged frontal assault mounted by Central challenging the validity of the Washington Township zoning ordinance.
Central's initial attack advances the premise that the ordinance materially conflicts with the spirit, purpose and intent of N.J.S.A. 30:9A-1 et seq. because the ordinance fails with exactitude to designate transitional facilities for former mental health patients as a permitted use in a residential zone. The contention lacks substance.
While it is manifest that N.J.S.A. 30:9A-1 et seq. provides a mechanism through which citizens of this State may receive mental health after-care services "in the community including foster home facilities, home visitation and half-way houses" (N.J.S.A. 30:9A-1 (h)), the statutory scheme not only fails to contain an express direction but is strikingly silent with respect to a requirement that such facilities be located in a specific district or zone in a municipality.[6] And there is nothing in the totality of the statutory *410 language which suggests that the Legislature, by the enactment of N.J.S.A. 30:9A-1 et seq., intended to require municipalities to revise their zoning ordinances to include a provision specifically mandating that mental health transitional facilities be a permitted use in a residential district. Although due recognition must be accorded the jural principle that remedial legislation is entitled to a liberal construction, the judicial function is not an instrument through which legislation can be extended beyond its stated *411 limits, no matter how ennobling the ideal or laudatory the purpose. Matawan v. Monmouth Cty. Bd. of Tax., 51 N.J. 291, 298 (1968); Dobbins v. Henry Hudson Regional High School Bd. of Ed., 133 N.J. Super. 13 (App. Div. 1947), aff'd 67 N.J. 69 (1975); Womack v. Howard, 33 N.J. 139, 142 (1960); Singleton v. Consolidated, 64 N.J. 357, 362 (1974); State v. Fearick, 69 N.J. 32, 37-38 (1976). Referring with approval to this rule of judicial restraint in State v. Fearick, our Supreme Court had occasion to say:
This cardinal rule of construction was incisively set forth by former Justice Benjamin Cardozo, of the United States Supreme Court in his classic treatise, The Nature of the Judicial Process, * * * in countless litigations, the law is so clear that judges have no discretion. They have the right to legislate within gaps, but often there are no gaps. We shall have a false view of the landscape if we look at the waste spaces only, and refuse to see the acres already sown and fruitful. I think the difficulty has its origin in the failure to distinguish between right and power, between the command embodied in a judgment and the jural principle to which the obedience of the judge is due. Judges have, of course, the power, though not the right, to ignore the mandate of a statute, and render judgment in despite of it. They have the power, though not the right, to travel beyond the walls of the interstices, the bounds set to judicial innovation by precedent and custom. None the less, by that abuse of power, they violate the law. * * * (Seventeenth Printing, Yale University Press, September, 1957 at p. 129). [at 37-38[
Central next argues that even though the provisions of the zoning ordinance do permit the establishment of transitional facilities in the O-R zone, the uncontroverted evidence demonstrates conclusively that forced location of transitional facilities in an O-R zone is contraindicated since such areas do not provide a normalized residential community-type setting so essential to the reorientation of former mental patients.[7] Therefore, reasons Central, the *412 failure of Washington Township to include the use in a residential district constitutes impermissible exclusionary zoning, a term conceptualized in South Burlington Cty. N.A.A.C.P. v. Mt. Laurel Tp., 67 N.J. 151 (1975) cert. den. 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975) (hereinafter Mt. Laurel). I do not agree.
Ever since the date of its pronouncement, the decision in Mt. Laurel has received widespread attention from innumerable legal commentators and periodicals. For a compilation of the various writings, see Oakwood at Madison Inc. v. Madison Tp., 72 N.J. 481, 495-496, n. 3 (1977). Additional instruction involving the issue of exclusionary zoning is found in cases decided by our Supreme Court subsequent to Mt. Laurel, e.g., Taxpayers Ass'n. of Weymouth Tp. v. Weymouth Tp., 71 N.J. 249 (1976); Shepard v. Woodland Tp. Comm. and Planning Bd., 71 N.J. 230 (1976); Oakwood at Madison Inc. v. Madison Tp., supra. Mt. Laurel and its progeny make it clear that "developing communities" are burdened with the responsibility of making available by ordinance diverse forms of housing stock, but the Mt. Laurel principles which condemn and invalidate exclusionary zoning ordinances are not applicable to a developed community lacking Mt. Laurel characteristics, which Washington Township so clearly is here. Segal Constr. Co. v. Wenonah Bd. of Adj., 134 N.J. Super. 421 (App. Div. 1975).
Moreover, municipalities have the unquestioned right to regulate the use of land within their borders. Our Constitution provides a source from which is drawn the power vested in the Legislature to enact general laws enabling municipalities to adopt zoning ordinances
* * * limiting and restricting to specified districts and regulating therein, buildings and structures according to their construction, and the nature and extent of their use, and the nature and extent of the uses of land and the exercise of such authority shall be deemed to be within the police power of the State. [N.J. Const. (1947), Art. IV, § VI, par. 2]
*413 The New Jersey Constitution mandates that all such laws concerning local governments, including zoning laws, be liberally construed in favor of municipal authority. N.J. Const. (1947), Art. IV, § VII, par. 11; Vickers v. Gloucester Tp. Comm., 37 N.J. 232, 242 (1962). By N.J.S.A. 40:55-30 and N.J.S.A. 40:55-31 the Legislature gave to municipalities broad power to create districts, regulate structures and the use of land through zoning ordinances. N.J.S.A. 40:55-32 defined the manner and scope to be employed by a municipality in exercising this power. In the enactment of N.J.S.A. 40:55D the Municipal Land Use Law, L. 1975, c. 291, § 1, effective August 1, 1976, parallel purpose provisions were provided in N.J.S.A. 40:55D-2(a) through (f), inclusive. Even where Mt. Laurel is implicated, as is not the situation here, a municipality, in carrying out the constitutionally and legislatively vested power, is not compelled to provide for every use within its boundaries. Vickers v. Gloucester Tp. Comm., supra; Fanale v. Hasbrouck Heights, 26 N.J. 320 (1958); Pierro v. Baxendale, 20 N.J. 17 (1955); Lionshead Lake, Inc. v. Wayne Tp., 10 N.J. 165 (1952), app. dism. 344 U.S. 919, 73 S.Ct. 386, 97 L.Ed. 708 (1953). It therefore follows that the failure to include a specific use in a particular zoning district, unless otherwise mandated by law, is not cause to invalidate a zoning ordinance; and with respect to requiring as a permitted use in a residential zone by ordinance, transitional facilities for former mental health patients, no such mandate exists.
The final thrust of Central's attack on the validity of the zoning ordinance is aimed at §§ 74-2 defining "Family," and 74-20 which delineates allowable uses in a "B" residential district. It is contended that those sections, read in pari materia, are overly-restrictive and thus constitute a denial of substantive due process. In November 1975, when Central first gained possession and use of the premises at 866 Crest Place as a transitional residence, § 74-2 defined "Family" as "Any number of individuals living together as *414 a single housekeeping unit and using certain rooms and housekeeping facilities in common." And § 74-12 provided in pertinent part, "A. One dwelling for one family or housekeeping unit. * * *"
On May 3, 1976, about three months after the institution of this action and at least five months following the establishment by Central of a transitional residence at 866 Crest Place, § 74-2 was amended by the enactment of Ordinance No. 76-5 to add the following:
1. 74-12 definition [the digital reference is erroneous and should read "74-2"]. Any number of persons living together as part of a religious order whose presence is necessary as a result of a house of worship, school or similar religious institution located immediately on or adjacent to the place of residence of said group shall also be deemed to constitute a family.
Foster children placed with any family in a single family dwelling by the Division of Youth and Family Services, or a duly incorporated child care agency, or children placed pursuant to law with families in single family homes, known as "Group Homes" shall also be deemed to constitute a single family home.
The taking of lodgers, boarders, roomers in all or part of the premises or the taking in of a subtenant of a portion of the premises shall not be deemed to constitute a family and is prohibited.
Lacking retroactivity, the amendment cannot be utilized to enjoin or make unlawful the use theretofore conducted by Central in the premises, but can at best make that use nonconforming. N.J.S.A. 40:55-48; N.J.S.A. 40:55D-68; Kirsch Holding Co. v. Manasquan, 111 N.J. Super. 359 (Law Div. 1970), rev'd on other grounds 59 N.J. 241 (1971); Dimitrov v. Carlson, 138 N.J. Super. 52, 58 (App. Div. 1975). Even if it is assumed, arguendo, that the amendatory language has applicability to this action and that the provision stating that "The taking of lodgers, boarders, roomers * * * shall not be deemed to constitute a family and is prohibited," is unduly limiting, exercise of the technique of judicial pruning is indicated to eliminate the offensive portion *415 so as to render the remainder of the ordinance constitutional. Collingswood v. Ringgold, 66 N.J. 350, 357 (1975).
Our courts have had the opportunity to consider and pass upon the definition and scope of the word "family" as contained in zoning ordinances seeking to regulate and limit residential useage and have not hesitated to render invalid sections of ordinances which too narrowly constrict the composition of a family; Berger v. State, supra ("family" defined as persons related by blood, marriage or adoption); Kirsch Holding Co. v. Manasquan, supra ("family" defined so as to rule out rentals to unrelated groups of summer residents); Gabe Collins Realty Inc. v. Margate City, 112 N.J. Super. 341 (App. Div. 1970) ("family" defined as persons related by blood, marriage or adoption, or not more than two unrelated persons). It is abundantly clear that where the word "family," as defined, excludes certain classes of persons from occupancy of residential dwellings predicated solely upon their relationship to each other, created by nature or law, the limitation is unreasonable and renders the tainted provision unconstitutional. In Berger v. State, supra, the Supreme Court, addressing itself to this very question, in establishing the proper standard stated:
While we have not hesitated to strike down zoning ordinances that fail to satisfy the demands of substantive due process, we are not unmindful of the problem confronting many municipalities which desire to maintain a prevailing family environment. Their need is to enact ordinances that will both withstand judicial scrutiny, and at the same time exclude uses that may impair the environment. We believe a satisfactory resolution to this problem would result, were local governments to restrict single family dwellings to a reasonable number of persons who constitute a bona fide single housekeeping unit. If such a requirement were incorporated into zoning ordinances, it would not only perpetuate the stability, permanence and other beneficial attributes long associated with single family occupancy but also preclude uses closely approximating boarding houses, dormitory and institutional living. Such an enactment  if carefully drawn  would be both reasonably related to the end of maintaining a peaceful family residential *416 style of living  an end we uphold as a legitimate goal of zoning  and yet be neither excessive nor overreaching in its sweep. [Emphasis supplied]
A mere reading of the definition of "family" contained in § 74-2 of the ordinance discloses a full and complete compliance with the standard set forth in Berger, supra. A limitation with respect to the number of persons who may occupy a residential dwelling is not imposed, nor is occupancy dependent upon a personal relationship created naturally or by law. That §§ 74-2 and 74-12 require the premises to be occupied by a single housekeeping or family unit can hardly be termed an unreasonable demand. Berger v. State, supra 71 N.J. at 225. See, 3 Rathkopf, The Law of Zoning and Planning, 200 (Supp. 1975). Although it is true that the words "bona fide" are absent from the ordinance, it is not necessary to interpret Berger to hold that such an omission renders the contested provisions fatally defective; rather, that a municipality has the right to limit by ordinance occupancy of residential dwellings to true single housekeeping units. Village of Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), leaving the question as to whether occupancy by groups create a bona fide housekeeping unit to the trier of fact for ultimate determination whenever the issue is raised.

III. The use by Central at 866 Crest Place as a transitional residence.

Lying at the heart of this dispute remains the question as to whether the use by Central of the premises at 866 Crest Place as a transitional residence for five former mental health patients violates the zoning ordinance as a prohibited use in a "B" residential zone.
The parameters of this inquiry are most appropriately set out in Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., supra, wherein the Supreme Court said

*417 As noted above, we have accorded the right to decent housing a preferred status under our State Constitution. South Burlington Cty. N.A.A.C.P. v. Mt. Laurel Tp., supra, 67 N.J. at 179. Therefore, any governmental action which significantly impinges upon the ability of some class of individuals to obtain this necessity of life deserves close judicial scrutiny [71 N.J. at 287]
The township initially argues that since Central is the tenant under the lease, but not the actual user of the premises, the use is barred under current zoning regulations. As a matter of fact, the building inspector, Marrone, testified that he based his denial of the use on that very ground. The position is not tenable. N.J.S.A. 40:55-30[8] does not empower a municipality through zoning to regulate the ownership of buildings or the types of tenancies permitted. It is obvious that the statute aforesaid utilizes the word "use" solely as a reference to the actual or physical purposes to which land or buildings are devoted and does not apply to the legal form by which ownership or possession is derived. Bridge Park Co. v. Highland, 113 N.J. Super. 219 (App. Div. 1971); Shepard v. Woodland Tp. Comm., 128 N.J. Super. 379, 382 (Ch. Div. 1974) rev'd an other grounds 71 N.J. 230 (1976). Therefore, denial on such a basis is groundless, where, as here, accurate application of zoning principles demand that legal formalisms not be permitted to defeat substance, for it is the actual use of property which is controlling. Ardolino v. Florham Park Bd. of Adj., 24 N.J. 94, 104 (1975); Wildlife Preserves, Inc. v. Poole, 84 N.J. Super. 159 (App. Div. 1964).
Washington Township asserts that the use by Central is quasi-institutional in nature and, therefore, urges that the use be relegated to the O-R zone where it is permitted. The answer to that contention lies in ascertaining from the evidence whether the residents properly fit the definition of a *418 "family" occupying the premises as a "single housekeeping unit."
The residents at 866 Crest Place are women, all of whom are recent dischargees from state or county mental institutions whose original commitment was civil and not criminal in nature. The word "discharge" is an expression in a conclusionary form that, by virtue of the factfinding process pursued by a court or by the medical director or chief of service of a mental hospital, a determination has been made that the patient is either not suffering from a mental illness or has recovered, and that further treatment in a hospital is unnecessary or undesirable. N.J.S.A. 30:4-44; N.J.S.A. 30:4-48. The notion that dischargees from mental institutions are mentally deranged, ill or "lunatics" is utterly without foundation, a disservice to those here involved or otherwise similarly situated and to society in general, and is undeserving of the court's further comment. There is a very real and clear distinction between those persons requiring institutionalization because of mental illness and those who do not.
The clear and convincing evidence is that admittance to the residence is accomplished on a purely voluntary basis; occupation is permanent in character and not transitory; the duties and responsibilities of the occupants in jointly performing the ordinary tasks of operating and maintaining a household, such as cooking, cleaning and shopping, cannot be distinguished from those performed by other home dwellers in the community; although Central provides a part-time social worker in the premises, that service is in a purely supervisory capacity, the sole purpose of which is aiding the reorientation of the residents to everyday living conditions. Thus, the residents present a picture very much akin to that of a traditional family and their lifestyle is not of a transient or temporary nature, and they cannot be classified with that category of persons defined as "lodgers, roomers or boarders." Berger v. State, supra, City of White Plains v. Ferraioli, 34 N.Y.2d 300, 357 N.Y.S.2d *419 449, 339 N.E.2d 756 (Ct. App. 1974); Oliver v. Chester Zoning Comm., 31 Conn. Supp. 197, 326 A.2d 841 (C.P. 1974). It is significant that no medical or therapeutic services are delivered at the residence, provision having been made to supply these needs at the main facility of Central in the Borough of Paramus, a place far removed. From all outward appearances the house and grounds at 866 Crest Place are indistinguishable from similar one-family residences in the community. The picture projected is not a happenstance, but flows directly from the preconceived design inherent in Project Haven to make available to former mental patients an environment fully equatable with that enjoyed by the average citizen in a residential community. There is nothing in the operation of the residence which is suggestive of other than its use as a "single housekeeping unit." The only sensible conclusion is that the present use and occupancy of the premises at 866 Crest Place as a transitional residence is in full compliance with the requirements of §§ 74-2 and 74-12 of the zoning ordinance insofar as they limit the use and occupancy to a "family" utilizing the premises as a "single housekeeping unit." Upon similar testing, it is manifest that there does not exist a violation of the amendatory Ordinance No. 76-5, even assuming its enforceability to the matter at hand. That conclusion is fully supported by the previously noted uncontroverted testimony of Marrone, that following his personal investigation at the residence he determined that the actual use complied with the ordinance.
Finally, the township maintains that the use should be disallowed because it imposes an undue burden on the community in that the residents present a threat to the general safety and to themselves. It is an argument founded on unsubstantiated fears created by a lack of knowledge and understanding of the real status of the residents and a true purpose of government. The importance of rehabilitation of the mentally handicapped to our society cannot be overestimated. State concern in this area is amply demonstrated *420 by the enactment of N.J.S.A. 30:9A-1 et seq. wherein the Legislature has carefully charted a course directing vastly expanded programs to meet the needs of less fortunate citizens who suffer from mental disabilities requiring care and treatment but not institutionalization. The legislation reflects modern methods of dealing with "after-care" mental health problems which recognize and approve as legitimate goals: the shortening of hospital stays; deinstitutionalization of patients as swiftly as possible under all circumstances; social integration of persons into community life with as little restriction as possible, and protection of the civil rights of the mentally afflicted. See, "American Psychiatric Association, Question of Adequacy of Treatment: A Position Statement," 123 Am. J. Psychiat. 1958 (1967); Morris, "Institutionalizing the Rights of Mental Patients: Committing the Legislature," 62 Cal. L. Rev. 957, 958 (1974); Chambers, "Alternative to Civil Commitment of the Mentally Ill: Practical Guides and Constitutional Imperatives," 70 Mich. L. Rev. 1107 (1972). See, generally, State v. Krol, 68 N.J. 236 (1975); Wyatt v. Stickney, 334 F. Supp. 373, 387 (M.D. Ala. 1972). Nor can we ignore the important policy considerations which have compelled the New Jersey Legislature to declare that discrimination against all persons in their attempts to obtain accommodations in real property is intolerable and abhorrent to our societal values and constitutes a violation of a civil right (see The Law Against Discrimination, N.J.S.A. 10:5-1 et seq.; N.J.S.A. 10:5-4), and no explanation has been offered as to why persons suffering from a mental handicap should be excluded from the zone of statutory protection afforded others more blessed.
Moreover, a thorough examination of the record fails to disclose any proof that the occupants at 866 Crest Place have caused any incident requiring action by the police or other regulatory authority. The mere writing of letters to the police by an occupant can hardly be construed as supportive of a claim of a "threat to general safety," and the testimony *421 of the Police Records Officer Martin certified to their harmlessness. In any event, should a resident, by reason of a relapse or recurring mental problem, require reinstitutionalization, Central is in the unique position because of its continuing oversight to render immediate and prompt attention to the problem without delay and, in all probability, far more swiftly and easily than one would have the right to expect in the case of other citizens not so supervised but requiring similar treatment. And should any of the residents exhibit disruptive or unruly behavior, ample means are available to properly restrict their actions through the proper exercise of the police power  and not by improper implementation of the zoning power to restrict and limit the use and occupancy of residential premises. Berger v. State, Kirsch Holding Co. v. Manasquan, Gabe Collins Realty, Inc. v. Margate City, all supra. Cf. Village of Belle Terre v. Borras, supra.
For the foregoing reasons it is held that the use by defendant Central of the premises at 866 Crest Place in the Township of Washington as a transitional residence for former mental patients does not violate the zoning ordinance.
Judgment is hereby rendered in favor of defendants and against plaintiff dismissing the complaint.
NOTES
[1] A "catchment" or service area is the area for which each community mental health center is assigned the responsibility of providing services, as designated by the county mental health board in accordance with the State Plan for Community Mental Health Centers (Plan) of the Division of Mental Health and Hospitals of the Department of Institutions and Agencies, which plan is discussed more fully, infra. There are six catchment areas in Bergen County.

The ten municipalities in Catchment Area No. 46 are: Elmwood Park, Saddle Brook, Fair Lawn, Paramus, Washington Township, Westwood, Hillsdale, Woodcliffe Lake, Park Ridge and Montvale.
[2] § 74-20 reads as follows:

Within a B Class District, no building or structure shall be used and no building or structure shall be erected to be used in whole or in part for any industrial, manufacturing or commercial purpose, nor for any other than the specified purposes authorized by § 74-12 hereof in respect to Class A District.
[3] The letter written by Aaron J. Rubin, Central's Community Affairs Director, stated in part as follows:

As a residence, only homemaking activities will take place. Former patients will live there, doing ordinary housekeeping chores, cooking, cleaning, etc. As a residence, no therapy or treatment is given on the premises. There will be one staff person at a time in the residence to help these former patients relearn their homemaking skills and to assist them in shopping, community activities (going to church), etc. The staff person will not sleep in. However, staff will be on 24 hour duty until such time as these former patients have regained their community living skills. At that time, the staff will be on duty 16 hours a day until the patients leave for independent living arrangements.
[4] "* * * There are no precise criteria." Such intent, which is seldom expressed, "is to be gleaned from a number of factors, including the nature and scope of the instrumentality seeking immunity, the kind of function or land use involved, the extent of the public interest to be served thereby, the effect local land use regulation would have upon the enterprise concerned and the impact upon legitimate local interests." Berger v. State, 71 N.J. at 218; Rutgers v. Piluso, 60 N.J. at 153; see Long Branch Div. of United Civic and Taxpayers Org. v. Cowan, 119 N.J. Super. 306, 309 (App. Div. 1972), certif. den. 62 N.J. 86 (1972); Washington Tp. v. Ridgewood, 26 N.J. 578 (1958) (abolishing the governmental proprietory distinctions); Aviation Services v. Hanover Tp. Bd. of Adj., 20 N.J. 275 (1956); Bloomfield v. N.J. Highway Auth., 18 237 (1955); Hill v. Collingswood, 9 N.J. 369 (1952); Newark v. N.J. Turnpike Auth., 7 N.J. 377 (1951).
[5] Nothing more graphically illustrates the deficiency in defendant's argument than the fact that since the completion of the trial of this action, but before the rendering of this decision, Central has suffered a complete and total collapse. After the State refused to continue funding under the conditions then existing, Central by a unilateral decision of its trustees terminated its operations. All of the services and obligations heretofore undertaken or rendered by Central involving Project Haven have been assumed and are being delivered without interruption by former satellite mental health agencies, to wit, Fair Lawn Mental Health Center, Inc., and Pascack Mental Health Center.
[6] The available information offers a clear indication to the contrary. On February 8, 1977 S-3117 and S-3118 were introduced before the New Jersey Senate which seek to amend §§ 53 and 2 of the Municipal Land Use Law, L. 1975 c. 291 (1976), respectively.

The proposed amendment to § 53 seeks to provide that:
No zoning ordinance shall, by any of its provisions or by any regulation adopted in accordance therewith, discriminate against, prevent or otherwise prohibit the provision for or location of appropriate and desirable sites for community-based residences for the mentally retarded, mentally ill or physically handicapped.
The proposed amendment to § 2 seeks to:
Insure the provision of appropriate and desirable sites for community-based residences for the mentally retarded, mentally ill or physically handicapped.
The Statement attached to both bills is identical and sheds considerable light on the purpose and intent of the legislation:
Authorities agree that the development, growth or recovery of certain mentally retarded, mentally ill or physically handicapped persons can be accelerated when such persons are given the opportunity to live in a residential community rather than in an institutional environment, while at the same time receiving shelter and supervision appropriate to their needs and other services available in the community. [Emphasis supplied]
Authorities agree that the development, growth or recovery of certain mentally retarded, mentally ill or physically handicapped persons can be accelerated when such persons are given the opportunity to live in a residential community rather than in an institutional environment, while at the same time receiving shelter and supervision appropriate to their needs and other services available in the community. [Emphasis supplied]
The proposed legislative amendments have been referred to the Committee on County and Municipal Government of the Senate where they presently remain and have never been enacted into law.
Query, whether the proposed legislative amendments mandate that zoning ordinances include transitional facilities for the mentally ill as a permitted use in a residential zone.
[7] The issue as to whether Central should be entitled to a use variance based upon "special reasons", pursuant to former N.J.S.A. 40:55-39(d), now N.J.S.A. 40:55D-70(d), was not tried before this court and is not here decided.
[8] See the parallel provision contained in the Municipal Land Use Law, N.J.S.A. 40:55D-62.